In re NVR L.P., et al., Debtors-in-Possession.

Bankruptcy No. 92–11704–T.

United States Bankruptcy Court,
E.D. Virginia,
Alexandria Division.

March 7, 1997.

Order for Judgment March 25, 1997.

Arnold M. Weiner, Allan P. Hillman,
Heather H.P. Vovakes, Weiner, Astrachan,

Gunst, Hillman & Allen, P.C., Baltimore, MD.

Francis P. Dicello, Ann E. Schmitt, Robert M. Marino, Reed, Smith, Shaw & McClay, Washington, DC.

Robert B. Cave, Bruce W. Gilchrist, Hogan & Hartson, McLean, VA.

Julia M. Freit, Lawrence P. Fletcher–Hill, Assistant Attorneys General of Maryland, Baltimore, MD.

Norman A. West, Godard, West & Adelman P.C., Fairfax, VA.

Michael G. McCabe, David W. Rose, Goehring, Rutter & Boehm, Pittsburgh, PA.

Robert C. Edmundson, Senior Deputy Attorney General of Pennsylvania, Pittsburgh, PA.

Paul Stahl, Assistant Attorney General, Virginia Department of Transportation, Fairfax, VA.

Joy Flowers Conti, Catherine Welsh Aceto, Kirkpatrick & Lockhart, L.L.P., Pittsburgh, PA.

Charles R. Mills, Linda Gardner, Kirkpatrick & Lockhart, L.L.P., Washington, DC.

Bruce W. Henry, Henry & Henry, Fairfax, VA.

Matthew M. Hoffman, Steele & Hoffman, Pittsburgh, PA.

Lee V. Price, Maiello, Andrews & Price, Pittsburgh, PA.

Nancy E. Carr, Walker & Carr, Beaver, PA.

Frank W. Hunger, Helen F. Fahey, J. Christopher Kohn, Tracy J. Whitaker, Phillip M. Seligman, Department of Justice, Civil Division, Washington, DC.

## MEMORANDUM OPINION

DOUGLAS O. TICE, Jr., Bankruptcy Judge.

On October 23, 1995, the debtors-in-possession in these consolidated Chapter 11 cases moved the court to construe a section of their confirmed plan as requiring taxing authorities in Pennsylvania and Maryland to refund certain real property transfer and recordation taxes. On April 4, 1996, the court entered a declaratory judgment order under Fed.R.Bankr.P. 3020(d) granting the debtors' motion. Just days before, however, the Supreme Court had held in *Seminole Tribe of Fla. v. Florida,* —— U.S. ——, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), that Congress cannot abrogate a state's Eleventh Amendment immunity when exercising its powers under Article I of the Constitution.

In light of the Supreme Court's decision, the taxing authorities filed motions asking this court to reconsider and to amend the April 4, 1996, order on the ground that *Seminole* has rendered 11 U.S.C. § 106[1] unconstitutional and that the court therefore lacked jurisdiction to enter the declaratory judgment against them. The court held a hearing on these motions on September 18, 1996, and then took the matter under advisement. On December 9, 1996, the United States Department of Justice obtained leave to intervene in this proceeding and to lodge its support for the constitutionality of § 106.

For the reasons set forth in this memorandum opinion, the court holds that § 106 of the Bankruptcy Code is unconstitutional and that the Eleventh Amendment precludes this court's order of April 4, 1996, from binding the Commonwealth of Pennsylvania and the Maryland circuit court clerks as collectors of a state transfer tax. Accordingly, the motions of these authorities to reconsider and to amend the order must be granted.

### Findings of Fact and Procedural History

The debtors[2] have built and financed new

---

1. Section 106 of the Bankruptcy Code consists of three subsections. In § 106(a), Congress abrogated the sovereign immunity of all governmental units with respect to certain sections of the Bankruptcy Code. In § 106(b), Congress declared that a governmental unit which files a proof of claim will be deemed to have waived its sovereign immunity with respect to a claim "that arose out of the same transaction or occurrence out of which the claim of such governmental unit arose." In § 106(c), Congress authorized the estate to offset any claim it may have against the governmental unit notwithstanding a claim of sovereign immunity.

2. The debtors who filed Chapter 11 petitions include NVR Limited Partnership (Case No. 92–11704), NVHomes Limited Partnership (Case No.

homes in Northern Virginia and the Maryland suburbs of Washington, D.C., for well over ten years. When the real estate market crumbled in the late 1980s, however, their once prosperous business suffered a bitter collapse. In the face of mounting financial pressure, the debtors were forced not only to implement an operational overhaul but to initiate negotiations with their bank group on a proposed restructuring of their working capital facilities. Even though the debtors prepared a detailed plan for reorganization, several of the banks balked at the idea of continuing to fund the enterprise. As a result, the debtors filed for relief under Chapter 11 of the Bankruptcy Code on April 6, 1992.[3]

On July 22, 1993, the court confirmed the debtors' second amended joint plan of reorganization. Section 4.13 of the plan provided, in pertinent part, that:

[p]ursuant to section 1146(c) of the Bankruptcy Code, the issuance, transfer, or exchange of securities pursuant to the Plan, and the transfer of, or creation of any lien on, any property of any Debtor under, in furtherance of, or in connection with the Plan shall not be subject to any stamp tax, real estate transfer tax, recordation tax, or similar tax.

The court's order of confirmation, which incorporated the thrust of this language, retained jurisdiction over the "interpretation or enforcement of the Plan."

In the summer of 1995, local and state taxing authorities in Maryland[4] and Pennsylvania[5] refused the debtors' request for a refund of transfer and recordation taxes collected on the debtors' post-petition, pre-confirmation transfers of real property. In October, the debtors[6] moved this court for a declaratory judgment fixing their rights under Section 4.13 of the plan. On April 4, 1996, the court entered an order concluding that the pre-confirmation transfers "were essential to the formulation, confirmation and consummation of the Confirmed Plan and to Debtors' effective reorganization and emergence from bankruptcy...." The order consequently declared that all real property transfers made between April 6, 1992, and September 30, 1993, were exempt from transfer and recordation taxes pursuant to 11 U.S.C. § 1146(c).[7]

Just days before the court's order, however, the United States Supreme Court had handed down its opinion in *Seminole Tribe of Fla. v. Florida*, — U.S. —, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). In *Seminole*, the Court considered whether Congress, by enacting the Indian Gaming Regulatory Act, had rightfully abrogated the states' immunity under the Eleventh Amendment.[8] Up until

92–11705), Ryan Operations General Partnership (Case No. 92–11706), Ryan Homes, Inc. (Case No. 92–11707), NVHomes Holding Limited Partnership (Case No. 92–11708), NVHolding, Inc. (Case No. 92–11709), Ryan General Partnership (Case No. 92–11710), NVHomes II Limited Partnership (Case No. 92–11711), NVCompanies, Inc. (Case No. 92–11712), Ryan Financial Services, Inc. (92–15740), and NVR Mortgage Limited Partnership (Case No. 92–15741).

3. At present, the court is jointly administering all the cases.

4. The Maryland taxing authorities include the circuit court clerks for Anne Arundel, Baltimore, Carroll, Harford, Howard, Montgomery, Prince George's, Frederick, and Washington Counties. The clerks of all nine counties collect a state transfer tax, and all but the clerk of Prince George's County collect a state recordation tax. Only the clerks of Anne Arundel and Howard Counties collect a county transfer tax.

5. The Pennsylvania taxing authorities include the Commonwealth itself, four townships (Hopewell,

Hampton, Shaler, and Moon), one borough (Franklin Park), and five school districts (Hampton Township, Shaler Area, Moon Area, North Allegheny, and Seneca Valley).

6. In fact, only NVR Homes, Inc.—the successor in interest to NVHomes Limited Partnership and Ryan Operations General Partnership—proffered the motion. For ease of reading, however, I will refer throughout this opinion to the debtors collectively.

7. Section 1146(c) states: "The issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under a plan confirmed under section 1129 of this title may not be taxed under any law imposing a stamp tax or similar tax."

8. The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

that time, only two provisions of the Constitution had been construed as bestowing upon Congress a power to do so. In *Fitzpatrick v. Bitzer,* 427 U.S. 445, 452–456, 96 S.Ct. 2666, 2669–71, 49 L.Ed.2d 614 (1976), the Court "recognized that the Fourteenth Amendment, by expanding federal power at the expense of state autonomy, had fundamentally altered the balance of state and federal power struck by the Constitution." [9] *Seminole,* —— U.S. at ——, 116 S.Ct. at 1125. This being the case, § 5 of the Fourteenth Amendment was interpreted as one means by which Congress could abrogate the immunity from suit guaranteed by the Eleventh Amendment. *Seminole,* —— U.S. at ——, 116 S.Ct. at 1125.

In *Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989), a plurality of the Court construed a second provision of the Constitution as empowering congressional abrogation. Noting that it "would be difficult to overstate the breadth and depth of the commerce power," four Justices reaffirmed that the Interstate Commerce Clause "displaces state authority even where Congress has chosen not to act." *Id.* at 20, 109 S.Ct. at 2285. Against this backdrop, the plurality held that Congress enjoyed a prerogative to abrogate when legislating pursuant to Art. I, § 8, cl. 3 of the Constitution. *Id.* at 19, 109 S.Ct. at 2284. Justice White, who provided the fifth vote, wrote separately to indicate that, while he agreed that "Congress has the authority under Article I to abrogate the Eleventh Amendment immunity of the States," he could not concur with "much of the [the plurality's] reasoning." *Id.* at 57, 109 S.Ct. at 2296 (White, J., concurring in part and dissenting in part).

The Court in *Seminole* observed that, "[s]ince it was issued, *Union Gas* has created confusion among the lower courts that have sought to understand and apply the deeply fractured reasoning." *Seminole,* —— U.S. at ——, 116 S.Ct. at 1127. Moreover, the Court found the plurality's rationale to have "deviated sharply from our established federalism jurisprudence and essentially eviscerated our decision in [*Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890)]." *Id.* With the dissent making no effort to defend the decision, the majority felt "bound to conclude that *Union Gas* was wrongly decided and that it should be, and now is, overruled." *Id.* at ——, 116 S.Ct. at 1128. In doing so, the Court announced that, even when Article I of the Constitution "vests in Congress complete lawmaking authority over a particular area, the Eleventh Amendment prevents congressional authorization of suits by private parties against unconsenting States." *Id.* at ——, 116 S.Ct. at 1131.

In light of *Seminole,* the taxing authorities moved this court to reconsider and to amend the April 4, 1996, order. In essence, they maintain that the Supreme Court's decision renders 11 U.S.C. § 106 an unconstitutional bid by Congress to abrogate the several states' immunity under the Eleventh Amendment.[10] If the stance has merit, this court

---

**9.** The relevant portions of the Fourteenth Amendment read:

> Section 1. ... No State shall make or enforce any law which shall abridge the privileges and immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.
>
> ...
>
> Section 5. The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.

**10.** Section 106 of the Code possesses a most tumultuous history. *See* S. Elizabeth Gibson, *Congressional Response to Hoffman and Nordic Village: Amended Section 106 and Sovereign Immunity,* 69 Am.Bankr.L.J. 311 (1995). The Bankruptcy Act of 1898 had made no mention of sovereign immunity or the Act's applicability to government entities. The Bankruptcy Reform Act of 1978, in an effort to fill this void, codified at § 106 a provision which sought to treat these entities much like any other private party. The Supreme Court frustrated this endeavor, however, in *Hoffman v. Connecticut Dep't of Income Maintenance,* 492 U.S. 96, 109 S.Ct. 2818, 106 L.Ed.2d 76 (1989), and *United States v. Nordic Village, Inc.,* 503 U.S. 30, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992). In these two cases, the Court "held that Congress [had] failed to speak with sufficient clarity in [former] § 106(c) to overcome the states' and federal government's sovereign immunity from suits for monetary relief." Gibson, *supra,* at 312. Not to be outdone, Congress enacted the Bankruptcy Reform Act of 1994 and amended § 106 with the express purpose of overruling both *Hoffman* and *Nordic Village.* *See* H.R.Rep. No. 103–835, at 42 (1994). U.S.Code Cong. & Admin.News 1994 pp. 3340, 3350 The Supreme Court now has responded

would have lacked the requisite jurisdiction to issue a declaratory judgment binding on the taxing authorities. The debtors of course take issue with this position and respond with several arguments: (1) that extending *Seminole*'s reach to § 106 abridges the debtors' privileges and immunities and denies the debtors equal protection of the laws under the Fourteenth Amendment; (2) that their motion for declaratory judgment does not constitute a "suit" under the Eleventh Amendment; (3) that the circuit court clerks, townships, school districts, and other local taxing authorities have no immunity under the Eleventh Amendment; and (4) that the taxing authorities waived their Eleventh Amendment immunity.[11]

### Discussion and Conclusions of Law

#### I.

■ The court first must determine the effect of *Seminole* on § 106 of the Bankruptcy Code. In particular, the court must ascertain whether any part of the section remains constitutionally viable in the wake of the Supreme Court's decision.[12] Since *Seminole* stands for the idea that no clause in Article I bestows upon Congress the power to abrogate a state's Eleventh Amendment immunity, the inquiry will focus on the end Congress envisioned when enacting each subsection in § 106.[13] If Congress sought in any

with *Seminole*, throwing the future of § 106 into doubt once again.

11. The United States Department of Justice, by leave of the court, has intervened in this matter to lodge its support for the constitutionality of § 106. Its memorandum of law, however, offers no ground for upholding the provision other than those already espoused by the debtors.

12. Of course, the Supreme Court long has held that "it is not on slight implication and vague conjecture that the legislature is pronounced to have transcended its powers, and its acts to be considered as void." *Fletcher v. Peck*, 6 Cranch (10 U.S.) 87, 128, 3 L.Ed. 162 (1810). *See also Concrete Pipe & Prods. of Cal., Inc. v. Construction Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 637, 113 S.Ct. 2264, 2287, 124 L.Ed.2d 539 (1993) (reaffirming that "legislative Acts ... come to the Court with a presumption of constitutionality").

13. When considering whether Congress has rightfully abrogated a state's constitutional immunity, a court must answer two questions: (1) whether Congress has unequivocally expressed

subsection to abrogate the immunity from suit secured by the Eleventh Amendment, *Seminole* instructs the court to declare it to be an unconstitutional exercise of the Article I power to "establish ... uniform Laws on the subject of Bankruptcies throughout the United States." U.S. Const., art. I, § 8, cl. 4.

■ The authority to abrogate "means that in certain circumstances the usual constitutional balance between the States and the Federal Government does not obtain." *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242, 105 S.Ct. 3142, 3147, 87 L.Ed.2d 171 (1985). With this principle in mind, "it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides the guarantees of the Eleventh Amendment." *Id.* at 243, 105 S.Ct. at 3147. Congress therefore must "express its intention to abrogate the Eleventh Amendment in unmistakable language in the statute itself." *Id.* Only with such an unequivocal expression will the courts choose to expand their own jurisdiction and to realign the balance envisioned by the Framers. *Id. See also Dellmuth v. Muth*, 491 U.S. 223, 227–28, 109 S.Ct. 2397, 2399–2400, 105 L.Ed.2d 181 (1989).

■ Without question, § 106(a)[14] manifests the requisite intent to abrogate. As

an intent to do so, and (2) whether Congress has acted pursuant to a valid exercise of power. *Seminole*, —— U.S. at ——, 116 S.Ct. at 1123. Since *Seminole* already has settled the second issue, as it relates to *any* power established under Article I of the Constitution, I need only consider the first.

14. Section 106(a) provides:

Notwithstanding any assertion of sovereign immunity, sovereign immunity is abrogated as to a governmental unit to the extent set forth in this section with respect to the following:

(1) Sections 105, 106, 107, 108, 303, 346, 362, 363, 364, 365, 366, 502, 503, 505, 506, 510, 522, 523, 524, 525, 542, 543, 544, 545, 546, 547, 548, 549, 550, 551, 552, 553, 722, 724, 726, 728, 744, 749, 764, 901, 922, 926, 928, 929, 944, 1107, 1141, 1142, 1143, 1146, 1201, 1203, 1205, 1206, 1227, 1231, 1301, 1303, 1305, and 1327 of this title.

(2) The court may hear and determine any issue arising with respect to the application of such sections to governmental units.

(3) The court may issue against a governmental unit an order, process, or judgment

indicated in a footnote above, Congress enacted this subsection in response to the Supreme Court's decision in *Hoffman v. Connecticut Dep't of Income Maintenance*, 492 U.S. 96, 109 S.Ct. 2818, 106 L.Ed.2d 76 (1989). In *Hoffman*, the Court had held that former § 106(c) [15] did not act to abrogate the states' Eleventh Amendment immunity. The narrow scope of the waivers in former subsections (a),[16] (b),[17] and (c)(2) had persuaded the Court that Congress had not intended former subsection (c)(1) as a broad abrogation. *Id.* at 101–02, 109 S.Ct. at 2822–23. Revised § 106(a), in contrast, resolves any ambiguity with its rather unequivocal language: "Notwithstanding any assertion of sovereign immunity, sovereign immunity is abrogated as to a governmental unit to the extent set forth in this section...." 11 U.S.C. § 106(a). Since Congress thus intended in § 106(a) to abrogate the states' Eleventh Amendment immunity, the holding in *Seminole* requires this court to find it unconstitutional.[18]

The purpose of §§ 106(b) [19] and (c) [20] cannot be ascertained so easily. The Court in *Hoffman* referred to their predecessors as "waivers." *Hoffman*, 492 U.S. at 101, 109 S.Ct. at 2822–23. The Seventh Circuit has indicated that those prior subsections concerned "cases in which a state, by filing a proof of claim, consents to have claims adjudicated by the bankruptcy court." *McVey Trucking, Inc. v. Secretary of State of Ill. (In re McVey Trucking, Inc.)*, 812 F.2d 311, 327 (7th Cir.1987), *cert. denied*, 484 U.S. 895, 108 S.Ct. 227, 98 L.Ed.2d 186 (1987). Indeed, the court in *McVey Trucking* suggested that the difference between former subsections (a) and (b) and former subsection (c) could be "conceptualized as the difference between state voluntary 'waiver' of immunity and congressional 'abrogation' or 'forced waiver' of immunity." *Id.* at 327 n. 9.

under such sections or the Federal Rules of Bankruptcy Procedure, including an order or judgment awarding a money recovery, but not including an award of punitive damages. Such order or judgment for costs or fees under this title or the Federal Rules of Bankruptcy Procedure against any governmental unit shall be consistent with the provisions and limitations of section 2412(d)(2)(A) of title 28.

(4) The enforcement of any such order, process, or judgment against any governmental unit shall be consistent with appropriate nonbankruptcy law applicable to such governmental unit and, in the case of a money judgment against the United States, shall be paid as if it is a judgment rendered by a district court of the United States.

(5) Nothing in this section shall create any substantive claim for relief or cause of action not otherwise existing under this title, the Federal Rules of Bankruptcy Procedure, or nonbankruptcy law.

15. Prior to the Bankruptcy Reform Act of 1994, § 106(c) provided:

Except as provided in subsections (a) and (b) of this section and notwithstanding any assertion of sovereign immunity—

(1) a provision of this title that contains "creditor," "entity," or "governmental unit" applies to governmental units; and

(2) a determination by the court of an issue arising under such a provision binds governmental units.

16. Former § 106(a) provided: "A governmental unit is deemed to have waived sovereign immunity with respect to any claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which such governmental unit's claim arose."

17. Former § 106(b) provided: "There shall be offset against an allowed claim or interest of a governmental unit any claim against such governmental unit that is property of the estate."

18. Since *Seminole*, the vast majority of courts have agreed that "the Bankruptcy Clause in Article I does not authorize Congress to abrogate state sovereign immunity and, specifically, that the Bankruptcy Clause did not authorize Congress to abrogate state sovereign immunity under 11 U.S.C. § 106(a)." *See Sparkman v. State of Fla. Dep't of Rev. (In re York–Hannover Devs., Inc.)*, 201 B.R. 137, 141 (Bankr.E.D.N.C.1996) (listing the cases in which courts have so ruled).

19. Revised § 106(b) provides: "A governmental unit that has filed a proof of claim in the case is deemed to have waived sovereign immunity with respect to a claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which the claim of such governmental unit arose."

20. Revised § 106(c) provides: "Notwithstanding any assertion of sovereign immunity by a governmental unit, there shall be offset against a claim or interest of a governmental unit any claim against such governmental unit that is property of the estate."

■ In sum, these decisions seem to hint that revised §§ 106(b) and (c) would be better deemed provisions for waiver rather than efforts at congressional abrogation. The subject for any waiver, however, must be the state rather than Congress. In other words, while Congress may "abrogate," only a state may "waive" its Eleventh Amendment immunity. It is simply impossible for Congress, through these subsections, to have served as a proxy for the states and dictated those circumstances in which the states would "waive" their prerogative under the Amendment.

■ In addition, the subsections cannot be read as merely fixing the test for any waiver by the states. Congress cannot alter the jurisprudence undergirding a provision of the Constitution any more than it, acting alone, can amend the Constitution itself. "One of the oldest principles of constitutional law holds that the judiciary's powers are qualitatively different when a controversy requires a judge to interpret and give effect to the Constitution. Courts do not allow 'statutory limitations' to block the enforcement of the Constitution." *Aguayo v. Christopher,* 865 F.Supp. 479, 487 (E.D.Ill.1994) (citing *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803)). Since "[i]t is emphatically the province and duty of the judicial department to say what the law is," *Marbury,* 5 U.S. (1 Cranch) at 177, Congress cannot dictate to the judiciary the standard for assessing whether a state has waived its Eleventh Amendment immunity. This begins and ends as a matter of constitutional interpretation.

■ Therefore, insofar as Congress undertook in revised §§ 106(b) and (c) to displace or to modify the meaning ascribed to the Eleventh Amendment by the courts, its endeavor must be deemed an attempted abrogation of the states' constitutional immunity. *See AER–Aerotron, Inc. v. Texas Dep't of Transp.,* 104 F.3d 677, 681 (4th Cir.1997) (recognizing that "the power to define waiver can become the functional equivalent of the power to abrogate"). To this extent, then, revised §§ 106(b) and (c) must fall with revised § 106(a). Specifically, where Congress sought to limit the reach of the Eleventh Amendment by exercising its power under the Bankruptcy Clause, *Seminole* renders the attempt unconstitutional.[21]

## II.

Notwithstanding the sweeping changes made by *Seminole,* the Supreme Court did reaffirm that, "through the Fourteenth Amendment, federal power extended to intrude upon the province of the Eleventh Amendment and therefore that § 5 of the Fourteenth Amendment allowed Congress to abrogate the immunity from suit guaranteed by that Amendment." *Seminole,* —— U.S. at ——, 116 S.Ct. at 1125. In this vein, the debtors insist that Congress enacted § 106 of the Bankruptcy Code not under the authority vested by the Bankruptcy Clause but pursuant to § 5 of the Fourteenth Amendment.

## A.

The debtors cite *Mather v. Oklahoma Employment Sec. Comm'n (In re Southern Star Foods, Inc.),* 190 B.R. 419 (Bankr.E.D.Okl. 1995), as their primary authority.[22] In *Southern Star Foods,* the Chapter 7 trustee had endeavored to recover an allegedly unauthorized post-petition transfer of sale pro-

21. At least one court in the post-*Seminole* era has ruled to the contrary, finding §§ 106(b) and (c) to constitute lawful instances of "forced waiver" rather than unconstitutional congressional abrogation. *See Ossen v. Connecticut Dep't of Social Servs. (In re Charter Oak Assocs.),* 203 B.R. 17, 21–22 (Bankr.D.Conn.1996). The opinion, however, offered little insight into the reason for this election, and I therefore will not follow it.

22. Several bankruptcy courts recently have considered this theory that § 106 was enacted under the auspice of the Fourteenth Amendment. Most, at least implicitly, have rejected the idea.

*See, e.g., Tri–City Turf Club, Inc. v. Kentucky Racing Comm'n (In re Tri–City Turf Club, Inc.),* 203 B.R. 617, 620 (Bankr.E.D.Ky.1996); *Ellenberg v. Board of Regents of the Univ. Sys. of Ga. (In re Midland Mechanical Contractors, Inc.),* 200 B.R. 453, 457–58 (Bankr.N.D.Ga.1996); *Schulman v. California State Water Resources Control Bd. (In re Lazar),* 200 B.R. 358, 382 (Bankr. C.D.Cal.1996). At least one court, however, has latched on to *Southern Star Foods* in upholding the constitutionality of § 106. *See Headrick v. Georgia (In re Headrick),* 200 B.R. 963, 967 (Bankr.S.D.Ga.1996).

ceeds to the Oklahoma Employment Security Commission. The OESC, in a preview of the *Seminole* debate, argued that Congress lacked the power to abrogate the State of Oklahoma's immunity when exercising its authority under Article I. As a consequence, the OESC believed that § 106 of the Code could be constitutional only if Congress had enacted it into law pursuant to § 5 of the Fourteenth Amendment. In a lengthy historical discussion, the bankruptcy court held that Congress had done just that.

The court reasoned that nearly all legislation passed by Congress under Article I of the Constitution implicates the privileges and immunities of the citizens of the United States, their right not to be denied life or liberty or property without due process of law, or their entitlement to equal protection under the laws. In other words, "[a]lthough such laws are enacted 'pursuant to Article I,' they are enforceable 'through the Fourteenth Amendment.'" *In re Southern Star Foods, Inc.*, 190 B.R. at 426. The court explicitly refused to "separate the power of national enactment under Article I from the power of national enforcement under the Fourteenth Amendment" or "to take what should be considered as a working whole, and dismember it into a matter of lifeless parts." *Id.* As a consequence, the court held that Congress had constitutionally abrogated the several states' Eleventh Amendment immunity by enacting § 106 of the Code.

■ It is true that "the constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise." *Woods v. Cloyd W. Miller Co.*, 333 U.S. 138, 144, 68 S.Ct. 421, 424, 92 L.Ed. 596 (1948). In particular, the Supreme Court has held that Congress need not "anywhere recite the words 'section 5' or 'Fourteenth Amendment' or 'equal protection'" when legislating under the authority granted by that Amendment. *Equal Employment Opportunity Comm'n v. Wyoming*, 460 U.S. 226, 243 n. 18, 103 S.Ct. 1054, 1064 n. 18, 75 L.Ed.2d 18 (1983). Nevertheless, "[b]ecause such legislation imposes congressional policy on a State involuntarily, and because it often intrudes on traditional state authority, [courts] should not quickly attrib-

ute to Congress an unstated intent to act under its authority to enforce the Fourteenth Amendment." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 16, 101 S.Ct. 1531, 1539, 67 L.Ed.2d 694 (1981).

Most courts since *Seminole* have refused to follow the rationale of *Southern Star Foods*. Their concerns have been stated most succinctly by the Sixth Circuit Court of Appeals: "If we were to say that an act is valid if it is rationally related to achieving equal protection of the laws, then § 5 becomes a license to Congress to pass any sort of legislation whatsoever." *Wilson–Jones v. Caviness*, 99 F.3d 203, 209 (6th Cir.1996). For this reason, courts have held that, "if Congress does not explicitly identify the source of its power under the Fourteenth Amendment, there must be something about the act connecting it to recognized Fourteenth Amendment aims," specifically those concerned with "discrimination by state actors on the basis of race or gender." *Id.* at 210; *see also Taylor v. Virginia Dep't of Transp.*, 951 F.Supp. 591, 597–98 (E.D.Va. 1996).

■ Having searched both the text and the legislative history of the Bankruptcy Code, this court is unable "to discern some legislative purpose or factual predicate" that supports, particularly in the context of § 106, an exercise of the power granted Congress by § 5 of the Fourteenth Amendment. *See Equal Employment Opportunity Comm'n*, 460 U.S. at 243 n. 18, 103 S.Ct. at 1064 n. 18 (1983). In fact, I can find no meaningful reference to the Amendment in the legislative comments accompanying any significant piece of bankruptcy legislation since 1978. In contrast, the Bankruptcy Clause often has been cited as the authority by which Congress enacted some revision to the bankruptcy laws. *See, e.g., Bankruptcy Act Revision: Hearings on H.R. 31 and H.R. 32 Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary*, 94th Cong. 164–67 (1975) (statement of Frank R. Kennedy, Professor, Univ. of Mich. Law Sch.) (defining a "uniform system" of bankruptcy and addressing the limits which it imposes on Congress); *Bankruptcy Reform Act: Hearings on S. 235 and S. 236*

*Before the Subcomm. on Improvements in Judicial Mach. of the Senate Comm. on the Judiciary,* 94th Cong. 499–500 (1975) (statement of Joseph Patchen, attorney) (noting that the "only basis for [municipal rehabilitation] to be effective at all is via the bankruptcy clause of the Constitution" and that "[s]o whether you call it bankruptcy, or a rose, or any other name, you must use the bankruptcy clause"); H.R.Rep. No. 95–595, at 47 (1977) U.S.Code Cong. & Admin.News 1978 pp. 5963, 6008 (concluding that "[t]here appears to be no reason why Congress cannot in the exercise of its power under the Bankruptcy Clause of the Constitution confer jurisdiction over all litigation having a significant connection with bankruptcy"); *Bankruptcy Amendments Act of 1993: Hearings on S. 540 Before the Subcomm. on Courts and Admin. Practice of the Senate Comm. on the Judiciary,* 103d Cong. 276 (statement of the American Bankers Association) (stating that "Congress' authority to create the trustee system derived not only from the bankruptcy clause of the Constitution, but also from Congress' Article I authority over the federal court system").

Moreover, nothing in the Bankruptcy Code appears to link the uniform law on bankruptcy to those traditional aims advanced by the Fourteenth Amendment. In the eight chapters which embody the Code, Congress devoted only one section to protecting debtors from discriminatory treatment. *See* 11 U.S.C. § 525. Even here, however, the statute prohibits only that discrimination based upon an individual having filed for bankruptcy. No mention is made of either race or gender, the "two central evils" which the Fourteenth Amendment was designed to eliminate. *Wilson–Jones,* 99 F.3d at 210.

### B.

Notwithstanding the absence of a connection between the Bankruptcy Code as statutory law and § 5 of the Fourteenth Amendment, both the debtors and the United States

Department of Justice have suggested that bankruptcy as a concept constitutes a "privilege or immunity" under § 1 of this Amendment.[23] In *Twining v. New Jersey,* 211 U.S. 78, 97, 29 S.Ct. 14, 18, 53 L.Ed. 97 (1908), the Supreme Court listed the privileges and immunities which by then had been recognized by the judiciary: (1) the right to pass freely from state to state, *Crandall v. Nevada,* 73 U.S. (6 Wall.) 35, 18 L.Ed. 745 (1867); (2) the right to petition Congress for redress of grievances, *United States v. Cruikshank,* 92 U.S. 542, 23 L.Ed. 588 (1876); (3) the right to vote for national officers, *Ku Klux Cases,* 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274 (1884); (4) the right to enter the public lands, *United States v. Waddell,* 112 U.S. 76, 5 S.Ct. 35, 28 L.Ed. 673 (1884); (5) the right to be protected against violence while in the lawful custody of a United States Marshall, *Logan v. United States,* 144 U.S. 263, 12 S.Ct. 617, 36 L.Ed. 429 (1892); and (6) the right to inform United States authorities of any violation of its laws, *In re Quarles,* 158 U.S. 532, 15 S.Ct. 959, 39 L.Ed. 1080 (1895). *See also Carr v. Axelrod,* 798 F.Supp. 168, 172 n. 1 (S.D.N.Y. 1992), *aff'd,* 996 F.2d 302 (2d Cir.1993), *cert. denied,* 510 U.S. 931, 114 S.Ct. 344, 126 L.Ed.2d 308 (1993); Laurence H. Tribe, *American Constitutional Law* § 7–4, at 555–56 (2d ed. 1988). The Court in *Twining* had neglected, however, to mention *Crutcher v. Kentucky,* 141 U.S. 47, 11 S.Ct. 851, 35 L.Ed. 649 (1891), which had established the right to carry on interstate commerce. *See* Tribe, *supra,* at 556. In addition, since 1908, one other right has been added to the *Twining* list. In *Oyama v. California,* 332 U.S. 633, 68 S.Ct. 269, 92 L.Ed. 249 (1948), the Court acknowledged as a constitutional privilege the right under 42 U.S.C. § 1982 to take and to hold real property. *See* Tribe, *supra,* at 556.

The relative dearth of jurisprudence surrounding the Privileges and Immunities Clause owes much to the *Slaughter–House Cases,* 83 U.S. (16 Wall.) 36, 79, 21 L.Ed. 394

---

**23.** The judiciary has recognized that the "privileges and immunities of national citizenship do not … encompass the right to have a federal question heard in a federal forum." *Carr v. Axelrod,* 798 F.Supp. 168, 172 (S.D.N.Y.1992), *aff'd,* 996 F.2d 302 (2d Cir.1993), *cert. denied,*

510 U.S. 931, 114 S.Ct. 344, 126 L.Ed.2d 308 (1993). Therefore, in order for this court even to consider invoking the Privileges and Immunities Clause as a means by which to uphold § 106 of the Code, bankruptcy itself must deemed a "privilege or immunity."

(1873), in which the Supreme Court found that the Clause protects only those rights "which owe their existence to the Federal government, its National character, its Constitution, or its laws." *See Lilley v. Missouri,* 920 F.Supp. 1035, 1044 (E.D.Mo.1996) (reaffirming that the Clause "has been narrowly interpreted to protect only uniquely federal rights"). Having thus removed from the purview of the Privileges and Immunities Clause any civil liberty traditionally associated with state protection, the Court in subsequent years relied almost exclusively on the Due Process Clause as the source of unenumerated constitutional rights. *See Lochner v. New York,* 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905) (introducing the concept of "substantive" due process of law). As a result, the Privileges and Immunities Clause has "remained essentially moribund." *Lutz v. City of York, Pa.,* 899 F.2d 255, 264 (3d Cir.1990).

▇ Against such a backdrop, this court can conceive of no ground which might warrant the "discovery" of a bankruptcy privilege in the Fourteenth Amendment. Although the United States Department of Justice has referred to the "right to obtain a fresh start" as belonging to the national citizenry, United States' Mem. of Law at 14, no authority has been cited as elevating that right to constitutional status. Indeed, the Supreme Court has explicitly declined to do so. In *United States v. Kras,* 409 U.S. 434, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973), a petitioner had sought leave to file for bankruptcy *in forma pauperis.* The Court observed that "[b]ankruptcy is hardly akin to free speech or marriage or to those other rights, so many of which are imbedded in the First Amendment, that the Court has come to regard as fundamental." *Id.* at 446, 93 S.Ct. at 638. Put more bluntly, "[t]here is no constitutional right to obtain a discharge of one's debts in bankruptcy." *Id.* This blanket ruling, combined with the judiciary having abandoned the Privileges and Immunities Clause as a vehicle by which to guarantee unenumerated rights under the Constitution, convinces the court that the argument advanced by the debtors and the United States Department of Justice must be rejected.

## C.

▇ The last point pressed by the debtors implicates the Equal Protection Clause of the Fourteenth Amendment. Again citing the bankruptcy court in *Southern Star Foods,* they contend that the bankruptcy laws cannot be uniformly enforced if § 106 should fall. I do not agree, however, with the Oklahoma bankruptcy court's effort to inextricably intertwine Congress' authority to enact a law pursuant to Article I and the right of a private party to enforce that law in a federal forum. On its face, the undertaking is contrary to both the principle of parity and the respect which the federal judiciary should accord to state courts. *See Mondou v. New York, New Haven, & Hartford R.R. Co.,* 223 U.S. 1, 58–59, 32 S.Ct. 169, 178–79, 56 L.Ed. 327 (1912). In any event, just as a disagreement between the circuits on the interpretation of a statute does not violate the Equal Protection Clause, *see Hawkins v. Agricultural Marketing Serv.,* 10 F.3d 1125, 1131–32 (5th Cir.1993), so the Fourteenth Amendment does not "assure uniformity or the absolute correctness of state court rulings," *Brosten v. Scheeler,* 360 F.Supp. 608, 613 (N.D.Ill.1973), *aff'd,* 495 F.2d 1375 (7th Cir.1974); *see also Beck v. Washington,* 369 U.S. 541, 554–55, 82 S.Ct. 955, 962–63, 8 L.Ed.2d 98 (1962).

▇ It must be acknowledged that *Seminole,* possibly with little foresight,[24] may have

24. Justice Stevens, in his dissent in *Seminole,* worried that the majority's decision "prevents Congress from providing a federal forum for a broad range of actions against States, from those sounding in copyright and patent law, to those concerning bankruptcy, environmental law, and the regulation of our vast national economy." *Seminole,* —— U.S. at ——, 116 S.Ct. at 1134 (Stevens, J., dissenting). The majority responded in a footnote that Justice Stevens' concern was "exaggerated both in its substance and in its significance." *Seminole,* —— U.S. at —— n. 16, 116 S.Ct. at 1131 n. 16. "Although the copyright and bankruptcy laws have existed practically since our nation's inception, and the antitrust laws have been in force for over a century, there is no established tradition in the lower federal courts of allowing enforcement of those federal statutes against the States." *Id.* The majority, however, apparently overlooked its decision just seven years before in *Hoffman v. Connecticut*

made the Bankruptcy Code far more cumbersome and difficult to enforce.[25] The decision, however, does not deny debtors or other parties in interest a forum in which to enforce their rights under the Code, which of course remains the "supreme Law of the Land." U.S. Const., art. VI, cl. 2. Indeed, the Court has held that the Supremacy Clause not only empowers a state court to exercise jurisdiction over a federal claim, *Claflin v. Houseman*, 93 U.S. 130, 23 L.Ed. 833 (1876), but compels it to do so, *Testa v. Katt*, 330 U.S. 386, 67 S.Ct. 810, 91 L.Ed. 967 (1947). Moreover, *Seminole* does not seem to remove from Congress its prerogative to abrogate the common law sovereign immunity enjoyed by states in their own courts by legislating pursuant to its Article I powers. *See Howlett v. Rose*, 496 U.S. 356, 375–78, 110 S.Ct. 2430, 2442–44, 110 L.Ed.2d 332 (1990). As a result, it is doubtful that a party in bankruptcy proceedings will be denied a hearing before some competent tribunal, though possibly not one with the expertise necessary to ensure the *most* uniform treatment under the Code.

In light of this analysis, the court must conclude that § 106 of the Bankruptcy Code was not enacted pursuant to § 5 of the Fourteenth Amendment. No reason exists, therefore, to alter my earlier holding that § 106 is unconstitutional to the extent that Congress purported to employ it as a means by which to abrogate the several states' immunity un-

der the Eleventh Amendment. There does remain, however, the question of whether the Eleventh Amendment can be invoked by the taxing authorities in this case.

### III.

In response to the taxing authorities' invocation of immunity under the Eleventh Amendment, the debtors contend that their motion for declaratory judgment does not constitute a "suit." In two distinct arguments, the debtors focus first on the "declaratory" nature of the action and then on the distinctive jurisdiction of this court. Both points, however, lack merit and must be rejected.

The debtors maintain that this action, being one for declaratory judgment, does not fall under the rubric of the Eleventh Amendment. In the order entered April 4, 1996, the court ruled that transfers of real property by or to the debtors from April 6, 1992, through September 30, 1993, were exempt from transfer and recordation taxes pursuant to 11 U.S.C. § 1146(c). In no part of the proceeding leading up to that order, however, did the debtors initiate an action under *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), to have the court enjoin officials of the taxing authorities from holding the funds in violation of the Bankruptcy Code.[26] Moreover, insofar as the

*Dep't of Income Maintenance*, 492 U.S. 96, 109 S.Ct. 2818, 106 L.Ed.2d 76 (1989), in which a Chapter 7 trustee had brought an action in a federal bankruptcy court seeking the turnover of funds held by the State of Connecticut. In any event, this case, as well as the hundreds like it across the nation, evince the flaw in the majority's prediction.

25. In *Gardner v. New Jersey*, 329 U.S. 565, 67 S.Ct. 467, 91 L.Ed. 504 (1947), a trustee had submitted to the "reorganization court" a petition to fix tax claims filed by the State of New Jersey. In that case, the Supreme Court observed that "[i]f the reorganization court lacked the power to deal with tax liens of a State, the assertion by a State of a lien would pull out chunks of an estate from the reorganization court and transfer a part of the struggle over the corpus into tax bureaus and other state tribunals. That would ... seriously impair the power of the court to administer the estate and adversely affect the power of ... the court to promulgate a reorganization plan." *Id.* at 577, 67 S.Ct. at 473.

These remarks illustrate the potentially irreconcilable conflict which may now exist between the Bankruptcy Clause and the Eleventh Amendment. Our national bankruptcy system, in which Congress intends debtors to retain the opportunity to reorganize and to obtain a fresh start, may be in grave danger if the states cannot be bound by orders issued by the federal courts under bankruptcy law. Justice Shiras was truly prophetic when he intimated nearly a century ago: "It would, indeed, be most unfortunate if the immunity of the individual states from suits by *citizens of other states*, provided for in the 11th Amendment, were to be interpreted as nullifying those other provisions which confer power on Congress...." *Prout v. Starr*, 188 U.S. 537, 543, 23 S.Ct. 398, 400, 47 L.Ed. 584 (1903).

26. Since the Supreme Court's decision in *Ex parte Young*, the federal judiciary has retained jurisdiction "over a suit against a state official when that suit seeks only prospective injunctive relief in order to 'end a continuing violation of

844

transfers of real property at issue had been made even before the plan's confirmation, the debtors certainly understood that the order addressed no threat of any future violation. The debtors' only purpose in seeking relief of a "declaratory" nature, then, must have been to obtain an order which could act as res judicata in some later proceeding to actually recover the monies.[27] The Supreme Court has deemed such an order to "have much the same effect as a full-fledged award of damages or restitution by the federal court, the latter kinds of relief being of course prohibited by the Eleventh Amendment." *Green v. Mansour,* 474 U.S. 64, 73, 106 S.Ct. 423, 428, 88 L.Ed.2d 371 (1985); *see also Manning v. South Carolina Dep't of Highway and Pub. Transp.,* 914 F.2d 44, 48–49 (4th Cir.1990). I find, therefore, that the declaratory nature of the debtors' action does not preclude it from constituting a "suit" under the Eleventh Amendment.

The debtors argue too that, in entering the April 4, 1996, order, the court acted pursuant to an *in rem* jurisdiction necessary to the very existence of a uniform law of bankruptcy. According to the debtors, this unique *in rem* jurisdiction over the bankruptcy estate endures as an exception to the Eleventh Amendment's general denial of jurisdiction to the federal courts. The Supreme Court, however, has rejected this theory rather explicitly. In *United States v. Nordic Village, Inc.,* 503 U.S. 30, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992), an officer of the Chapter 11 debtor withdrew corporate funds and had the Internal Revenue Service apply them to his individual tax liability. The bankruptcy court authorized the trustee to recover the transfer from the Service, and both the district court and the court of appeals affirmed. The Supreme Court reversed, stating that it has "never applied an *in rem* exception to the sovereign-immunity bar against mone-

tary recovery, and [has] suggested that no such exception exists." *Id.* at 38, 112 S.Ct. at 1017. The Court simply found nothing peculiar to the bankruptcy system which would warrant a suspension of the federal government's immunity in this setting. In these cases, the debtors have presented no point of law to suggest that a different rule should be applied to a state's immunity under the Eleventh Amendment. Therefore, I find that the nature of this court's jurisdiction does not except the debtors' "suit" from the reach of the Eleventh Amendment.

IV.

■ The debtors next contend that certain taxing authorities cannot be "states" under the Eleventh Amendment.[28] The Court of Appeals for the Fourth Circuit recently established the standard for reviewing such an argument in *Harter v. Vernon,* 101 F.3d 334 (4th Cir.1996). In *Harter,* the court had to ascertain whether a county sheriff in North Carolina enjoyed immunity under the Eleventh Amendment. Though reaffirming that constitutional immunity extends only to "state agencies that may be properly characterized as arms of the State," *id.* at 337 (internal quotations omitted), the court acknowledged the difficulties in determining whether a government entity with both state and local characteristics constitutes an "arm of the state."

Previously, in *Ram Ditta v. Maryland Nat'l Capital Park and Planning Comm.,* 822 F.2d 456 (4th Cir.1987), the court had adopted a "four-part, non-exclusive inquiry" to determine "when an entity is the alter ego of a state for Eleventh Amendment purposes." *See also Ristow v. South Carolina Ports Auth.,* 27 F.3d 84, 85 (4th Cir.1994), *vacated by* 513 U.S. 1011, 115 S.Ct. 567, 130 L.Ed.2d 485 (1994). The first, and "most

federal law.'" *Seminole,* — U.S. at —, 116 S.Ct. at 1132.

**27.** Indeed, the debtors repeatedly insisted in their briefs that the taxing authorities, as creditors, will be bound by the confirmed plan under the principle of res judicata. *See* NVR's Consolidated Opp'n to the Mots. for Recons. at 31–35; NVR's Supplemental Mem. in Opp'n to the Mots. for Recons. at 16.

**28.** Of course, even the debtors do not dispute that the Commonwealth of Pennsylvania itself possesses immunity under the Eleventh Amendment. Therefore, I will restrict my comments on this subject to the Maryland entities and those Pennsylvania taxing authorities of a more "local" nature.

important consideration," is whether "the state treasury will be responsible for paying any judgment that might be awarded." *Ram Ditta*, 822 F.2d at 457. The three remaining factors include, but have not been limited to, (1) whether the entity exercises a significant degree of autonomy from the state; (2) whether the entity participates in local rather than state concerns; and (3) how state law characterizes and treats the entity. *Id.* at 457–58.

This test endured without alteration until the Supreme Court issued its opinion in *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994). In *Hess*, the Court addressed the manner in which the Eleventh Amendment should be applied to multistate entities created under the Compact Clause.[29] When factors similar to those articulated in *Ram Ditta* pointed in different directions, the Court concluded that "the Eleventh Amendment's twin reasons for being remain our prime guide." *Id.* at 47, 115 S.Ct. at 404. Those reasons had been identified as a concern that federal court judgments not deplete state treasuries and a need to preserve the integrity retained by each state in the federal system. *Id.* at 38–40, 115 S.Ct. at 400. In particular, the Court recognized "the vulnerability of the State's purse as the most salient factor in Eleventh Amendment determinations." *Id.* at 48, 115 S.Ct. at 404.

█ With *Hess* having bolstered *Ram Ditta*'s emphasis on the state treasury factor, the court of appeals confirmed in *Harter* that an entity will be immune from suit if the state will pay the judgment. *Harter*, 101 F.3d at 339. In such an instance, "the other *Ram Ditta* factors need not be considered." *Id.* The court noted too that the state treasury factor is "generally determinative" even if the state will not pay the judgment. Although courts still must evaluate the remaining *Ram Ditta* factors, they should "keep[ ] in mind that the most important consideration weighs against immunity." *Id.* at 340.

Applying this analysis to our case,[30] the Pennsylvania townships, boroughs, and

---

**29.** The Compact Clause provides: "No State shall, without the Consent of Congress, ... enter into any Agreement or Compact with another State...." U.S. Const., Art. I, § 10, cl. 3.

**30.** It is worth noting that the Court of Appeals for the Fourth Circuit has become divided over the intricacies of this examination. In *Gray v. Laws*, 51 F.3d 426 (4th Cir.1995), another panel of the court had considered the Eleventh Amendment defense advanced by a county and its health department supervisors. Addressing the impact of *Hess*, the court had observed that "the Court never indicated whether the considerations of the state treasury and state sovereignty are generally dispositive if they both suggest the same conclusion, regardless of the conclusion suggested by the other factors." *Gray*, 51 F.3d at 433. With no "relative weights ascribed to these factors," the court held that "a determination that the state treasury will be liable for a particular judgment is largely, if not wholly, dispositive of entitlement to Eleventh Amendment immunity in the single state context." *Id.* "If, on the other hand, the state's treasury will not be affected by a judgment in the action, then the availability of immunity ... must be determined by resort to the other relevant considerations referenced by the Court." *Id.* at 434.

When the decision in *Harter* was handed down, a published order accompanied it. According to that order, a member of the court had requested a poll on whether the appeal should have been reheard *en banc*. After seven of the thirteen judges voted against a rehearing, *Harter*, 101 F.3d at 343, Judge Luttig filed a vigorous dissent joined by Chief Judge Wilkinson and Judges Russell, Wilkins, and Williams. The dissent noted at the outset that, "[o]ut of respect for the rule of law and principles of *stare decisis*, and in order to avoid confusion concerning the law in our circuit, we have adopted for our court a rule that one panel cannot overrule or modify a published opinion of another panel." *Id.* at 343 (Luttig, J., dissenting from the order denying a rehearing *en banc*). Instead, only the "full court sitting *en banc*" may modify established precedent. *Id.* The dissent believed the panel in *Harter* to have acted contrary to this principle and found their decision to be a "flagrant disregard of our recent opinion" in *Gray* and "demonstrably at odds with prior case law." *Id.*

Three particular problems with *Harter* were stressed by the dissent: (1) it "does not accord any particular significance to the state sovereignty factor," *id.* at 344; (2) it holds that "the impact on the state treasury was necessarily dispositive of the inquiry," *id.* at 345; and (3) it "implied that [other] Eleventh Amendment concerns are to be discounted and downgraded when the state treasury is not implicated," *id.* In light of the inconsistency between *Gray* and *Harter* and the court's refusal to rehear *Harter en banc*, the dissent argued that the later decision "cannot hereafter be regarded as controlling authority on questions of Eleventh Amendment immunity with regard to matters where the two opinions conflict." *Id.* at 344.

The division within the court of appeals on this question presents a substantial hurdle, since the

school districts may be disposed of rather easily. Not only have they failed even to hint at evidence that a judgment imposed upon them will draw upon the coffers of the Commonwealth, but these local entities have neglected to submit a brief or a pleading which could justify a finding by this court that the reach of the Eleventh Amendment extends to them. Indeed, the law appears to compel a contrary result. Courts dating back to the nineteenth century have been uniform in their agreement that political subdivisions, such as townships and boroughs, cannot invoke their parent state's constitutional immunity from suit in federal court. *See Lincoln County v. Luning,* 133 U.S. 529, 530, 10 S.Ct. 363, 363, 33 L.Ed. 766 (1890); *see also Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency,* 440 U.S. 391, 400–01, 99 S.Ct. 1171, 1176–77, 59 L.Ed.2d 401 (1979). Moreover, the Third Circuit recently has held that Pennsylvania school districts, particularly insofar as they have the authority to issue bonds and collect taxes, cannot partake of the Commonwealth's Eleventh Amendment immunity. *Lester H. v. Gilhool,* 916 F.2d 865, 870–71 (3d Cir.1990). Therefore, this court has sufficient jurisdiction to bind these local taxing authorities of Pennsylvania with the April 4, 1996, order.

■ The situation in Maryland presents more of a problem. The circuit court clerks and other local officials have become embroiled in this proceeding in three distinct capacities: (1) as collectors [31] of county transfer taxes assessed by and paid to the counties (Md.Code Ann., Tax–Prop. §§ 13–401 to –408); (2) as collectors [32] of recordation taxes assessed under state law but paid to the counties (Md.Code Ann., Tax–Prop. §§ 12–101 to –113); and (3) as collectors [33] of state transfer taxes assessed by and paid to the State (Md.Code Ann., Tax–Prop. §§ 13–201 to –209). The debtors concede that Maryland's Eleventh Amendment immunity will insulate the clerks when acting in the third role.[34] NVR's Consolidated Opp'n to the Mots. for Recons. at 16–21. The parties dispute, however, whether the clerks can enjoy the same protection when performing the first and second duties.

As indicated earlier, the court first must ascertain the impact of a judgment against the officials, in each of their two relevant capacities, on the Maryland treasury. This inquiry in turn necessitates a look at the taxes at issue. The county transfer tax is imposed by the governing body of a county at its option. Md.Code Ann., Tax–Prop. § 13–402.1(a). The county then appoints a collector each year, Md.Code Ann., Tax–Prop. § 4–101(b), who will receive the taxes and remit them to the appropriate county official. Md.Code Ann., Tax–Prop. § 4–201. The recordation tax, which is much like an excise tax, has been imposed under State law. Md.Code Ann., Tax–Prop. § 12–102. In every county except Prince George's, the State has required that the circuit court clerk

---

dissent correctly points out that one panel cannot overrule another. *See, e.g., Norfolk & W. Ry. v. Director, Office of Workers' Compensation Programs,* 5 F.3d 777, 779 (4th Cir.1993). I have to rely, however, on the majority's belief that *Harter* does not effectively modify or do away with the reasoning employed in *Gray.* I therefore have elected to follow *Harter,* treating it as only having "refined" the Eleventh Amendment analysis developed earlier.

**31.** Again, the circuit court clerks of Anne Arundel and Howard Counties collect the county transfer tax in their respective counties. The departments of finance of Baltimore and Montgomery County and the treasurer of Harford County, entities which also collect the county transfer tax, "were not originally notified as interested parties to the Motion for Declaratory Judgment, because they had not ruled on NVR's refund claims at the time the Motion was filed, briefed or argued." NVR's Consolidated Opp'n to the Mots. for Recons. at 17 n. 12. At some

time prior to June 1996, however, those entities had denied the debtors' claim for a refund, and yet, the debtors never moved to join them as defendants to this action. No reason exists, therefore, to consider the question of their status under the Eleventh Amendment.

**32.** Again, the circuit court clerks for Anne Arundel, Baltimore, Carroll, Harford, Howard, Montgomery, Frederick, and Washington Counties collect the state recordation tax.

**33.** Again, the circuit court clerks of all nine counties collect the state transfer tax.

**34.** Even if the debtors had not yielded on this point, the result is obvious. Since any refund of the state transfer tax would be drawn from the Maryland treasury, *Harter* directs that the circuit court clerks be deemed immune from suit in their capacity as collectors of the tax.

collect the tax, Md.Code Ann., Tax–Prop. § 12–109(b)(1), and then remit the funds to the governing body of the county. Md.Code Ann., Tax–Prop. § 12–110(a)(1).

Whether revenue from these taxes should be deemed "local" or "state" came into doubt in 1984, when the Legislative Policy Committee of the Maryland General Assembly commissioned a task force on the clerks of the circuit courts. The issues explored by the task force included the funding basis for, the budgetary oversight of, and the functions performed by the clerks' offices. Clerks of Court Task Force, Report to the General Assembly of 1984, at 1 (1984). The task force noted that, "[p]resently, the Constitution provides that the expenses of these offices shall be paid from the fees and commissions of the office" and that, "[w]hen these revenues are insufficient, statute provides that they *may* be supplemented from the state budget." *Id.* Since the clerks' funding system depended heavily on revenue tied to real estate transactions, which in turn were subject to swings in the general economy, the task force observed that "the net effect of clerks' offices on the general funds has been unpredictable." *Id.* at 2.

In light of these findings, the task force recommended that "the State Constitution be amended to provide that clerks' offices shall no longer be funded from the fees of their office. Instead, revenues of the clerks should be revenues of the State and clerks' operations should be provided through the State budget." *Id.* at 7. As a consequence, the Maryland General Assembly in 1986 amended Article IV, Section 10 of the State's constitution to read: "The offices of the Clerks shall be funded through the State budget. All fees, commissions, or *other revenues established by Law for these offices* shall be State revenues, unless provided otherwise by the General Assembly." Md. Const., art. IV, § 10(b) (emphasis added).

With the enactment of this amendment, a question arose as to whether the county transfer and recordation *taxes* could be deemed "other revenues established by Law for these offices" and therefore "State revenues." The court can find no provision in the Maryland Code, however, that directs those counties which receive the county transfer and recordation taxes to use this revenue to fund even in part the circuit court clerks. Maryland law simply maintains that "[t]he administration, expenditure, and accounting of all sum or sums raised, borrowed, or obtained by any county ... shall be subject to the control of the county commissioners or the public body in the county that the county commissioners designated...." Md.Ann. Code art. 24, § 9–110(a). The State gives the governing body of a municipal corporation identical authority. Md.Ann.Code art. 24, § 9–110(b).

Even more persuasive in this case, though, is the manner in which Maryland law speaks of any refund of these taxes. Pursuant to statute, refunds shall be paid "[f]rom the money that the county or municipal corporation designates for the refund payment; or, [i]f no money has been designated, from any money *of the county or municipal corporation* in the hands of the tax collector." Md. Ann.Code art. 24, § 9–713(b) (emphasis added). As in every other reference to the revenue from these two taxes, the Maryland Code again treats the funds as belonging to the relevant county or municipal corporation alone, which in turn has the discretion to use the monies for any lawful purpose. Notwithstanding the revised constitutional provision, then, the court must find that the county transfer and recordation taxes constitute "local" revenue and that a refund of those taxes will have no impact on the Maryland treasury.

Having thus found that the Maryland treasury will not be affected by a judgment against the circuit court clerks in their capacity as collectors of the county transfer and recordation taxes, the court must "examine the remaining *Ram Ditta* factors, keeping in mind that the most important consideration weighs against immunity." *Harter,* 101 F.3d at 340. As mentioned earlier, *Ram Ditta* requires the court to evaluate whether the entity exercises a significant degree of autonomy from the state, whether the entity participates in local rather than state concerns, and how state law characterizes and treats the entity. *Ram Ditta,* 822 F.2d at 457–58.

Under the Constitution of Maryland, the circuit court clerk for each county is elected by the residents of that county. Md. Const. art. IV, § 25. The clerk's duties range from keeping custody of books and records to issuing writs from the circuit court. Md. Code Ann., Cts. & Jud.Proc. § 2–201. As stated earlier, the constitution now provides that each clerk will be funded from the State budget. Md. Const. art. IV, § 10(b); Md. Code Ann., Cts. & Jud.Proc. § 2–504.1. While statutory law governs the clerk's salary, Md.Code Ann., Cts. & Jud.Proc. § 2–504, rules governing the appointment, removal, classification, and salaries of the clerk's employees have been set by the Maryland Court of Appeals. Md.Code Ann., Cts. & Jud.Proc. § 2–505.

These provisions indicate that the circuit court clerk, in essence, is a county official regulated primarily by State law, funded from the State treasury, and overseen by the State judiciary. In the context of the *Ram Ditta* factors, then, the court concludes that the clerk of the circuit court does not exercise a great degree of autonomy from the State and that Maryland law goes to great lengths to govern the clerk's operations. Nevertheless, the clerk functionally is a county agent concerned more with the concerns of the local circuit court rather than those of the State. Since these "indicators of immunity point in different directions," *Hess*, 513 U.S. at 47, 115 S.Ct. at 404, the absence of any impact on the Maryland treasury is dispositive and, according to *Harter*, tips the balance against a finding of constitutional immunity. As a result, the Maryland taxing authorities have no basis to claim immunity under the Eleventh Amendment when collecting the county transfer and recordation taxes.

In light of the foregoing discussion, then, the court finds that only the Maryland circuit court clerks as collectors of the state transfer tax and the Commonwealth of Pennsylvania still have a basis for invoking the Eleventh Amendment in these cases.

V.

In their last argument, the debtors contend that the taxing authorities have waived their Eleventh Amendment immunity from suit in this court. Before turning to the merits of the debtors' position, some comment first should be made on the Eleventh Amendment as a whole. More than any other provision of the Constitution taken singly, this Amendment reminds us of the precarious state of our union during its early years. Indeed, the Amendment was proposed just two days after the Supreme Court decided a matter in which the State of Georgia refused to even appear. *See Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419, 1 L.Ed. 440 (1793). Since being enacted, it often has been used as the balance with which the prerogatives of the several states have been weighed against the supremacy of the federal government. *See* John E. Taylor, Note, *Express Waiver of Eleventh Amendment Immunity*, 17 Ga.L.Rev. 513, 520–22 (1983). At stake each time has been the manner in which we, as a sovereign people, choose to be governed.

This concern for federalism has tended to guide the judiciary's effort to fashion a proper jurisprudence for the Eleventh Amendment. *See generally* David L. Shapiro, *Wrong Turns: The Eleventh Amendment and the Pennhust Case*, 98 Harv.L.Rev. 61 (1984). The result has been a move away from a strict reading of its text. Since *Hans v. Louisiana*, 134 U.S. 1, 14–15, 10 S.Ct. 504, 506–07, 33 L.Ed. 842 (1890), the Supreme Court has "understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition of our constitutional structure which it confirms: that the States entered the federal system with their sovereignty intact...." *Blatchford v. Native Village of Noatak*, 501 U.S. 775, 779, 111 S.Ct. 2578, 2581, 115 L.Ed.2d 686 (1991). With such an unequivocal incorporation of the concept of sovereign immunity into the Eleventh Amendment, the federal courts no longer have been able to hold that the Amendment is wholly jurisdictional in nature, that it acts only to limit the grant of jurisdiction found in Article III of the Constitution. *Hans* shifted the focus from the federal judiciary, and its reach under Article III, to the states and their status as equal sovereigns.

With Eleventh Amendment jurisprudence being developed along this new line, it has become "possible to argue that a state could consent to be sued in federal court despite the Eleventh Amendment; or, in other words, that the state could waive the immunity conferred by the Eleventh Amendment." John V. Orth, *The Judicial Power of the United States* 123 (1987). The Supreme Court has insisted, however, that "[c]onstructive consent is not a doctrine commonly associated with the surrender of constitutional rights." [35] *Edelman v. Jordan*, 415 U.S. 651, 673, 94 S.Ct. 1347, 1360, 39 L.Ed.2d 662 (1974); *see also Welch v. Texas Dep't of Highways and Pub. Transp.*, 483 U.S. 468, 473, 107 S.Ct. 2941, 2945–46, 97 L.Ed.2d 389 (1987). Therefore, effect will be given to a state's waiver of its Eleventh Amendment immunity "only where stated by the most express language or by such overwhelming implication from the text as [will] leave no room for any other reasonable construction." *Edelman*, 415 U.S. at 673, 94 S.Ct. at 1361 (internal quotation omitted); *see also Port–Auth. Trans–Hudson Corp. v. Feeney*, 495 U.S. 299, 305–06, 110 S.Ct. 1868, 1872–73, 109 L.Ed.2d 264 (1990); *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 239–40, 105 S.Ct. 3142, 3146, 87 L.Ed.2d 171 (1985). The consent, in other words, must be "unequivocally expressed," *Pennhurst State Sch. & Hosp. v. Halderman (Pennhurst II)*, 465 U.S. 89, 99, 104 S.Ct. 900, 907, 79 L.Ed.2d 67 (1984), and will be strictly construed, *Lelsz v. Kavanagh*, 807 F.2d 1243, 1253 (5th Cir.1987), *cert. dismissed*, 483 U.S. 1057, 108 S.Ct. 44, 97 L.Ed.2d 821 (1987). For instance, a state will not waive its constitutional immunity from suit in federal courts merely by consenting to suit in its own courts. *Feeney*, 495 U.S. at 306, 110 S.Ct. at 1873.

At least one commentator has noted that, "[s]ince state governments seldom deal explicitly with the eleventh amendment," express waiver usually will be the product of a federal court's construction of state constitutions, state legislation, state conduct as a federal litigant, or state court decisions. Taylor, *supra*, at 526–27. After a thorough review of the constitutional, statutory, and common law of both Maryland and Pennsylvania, I can find no provision which would indicate that the immunity secured by the Eleventh Amendment has been waived by the taxing authorities in this case. Maryland law simply does not speak to such a waiver in the context of either a tax controversy or a bankruptcy,[36] and no Maryland court has found cause to press the subject very far on its own.[37] The Pennsylvania legislature has

---

**35.** At one time, the Supreme Court had insisted that an implied waiver might arise where a state consciously enlisted in and accepted the benefits of a federally regulated program which required, as a condition of participation, that the state surrender its constitutional immunity. *See Parden v. Terminal Ry. Of the Ala. State Docks Dep't*, 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964). A decade later, however, the Court significantly narrowed this concept in *Employees of the Dep't of Pub. Health & Welfare v. Dep't of Pub. Health & Welfare*, 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973), and *Edelman v. Jordan*, 415 U.S. 651, 673, 94 S.Ct. 1347, 1360–61, 39 L.Ed.2d 662 (1974). More recently, in *Welch v. Texas Dep't of Highways and Pub. Transp.*, 483 U.S. 468, 478, 107 S.Ct. 2941, 2948, 97 L.Ed.2d 389 (1987), the Court expressly overruled *"Parden*'s discussion of congressional intent"* and, though not reaching the question of implied waiver, seemed to suggest that the doctrine is no longer viable. In any event, since the cases before this court do not involve a federal program similar to that in *Parden*, the issue need not be addressed in any depth here.

**36.** While the Maryland constitution does not mention the Eleventh Amendment, the State code addresses it in five instances. Md.Code Ann., Educ. § 12–104(g)(5) and Md.Code Ann., Educ. § 14–204(g)(5) prevent subsections governing Maryland universities and colleges from being construed as waiving or abrogating those universities' and colleges' immunity under the Eleventh Amendment. Md.Code Ann., Nat.Res. § 3–501(s) precludes a private party from initiating a suit under the Interstate Environmental Compact which would infringe upon the State's Eleventh Amendment immunity. Md.Code Ann., State Gov't § 12–103(2) protects any defense to the State Tort Claims Act which arises under the Eleventh Amendment. Md.Ann.Code art. 88A, § 13A(g)(3) refuses to waive the State's Eleventh Amendment immunity in a suit arising out of Maryland's human resources program for Montgomery County.

**37.** The Maryland judiciary does recognize that, if the State files suit in federal court as a plaintiff, it waives any immunity under the Eleventh Amendment "with respect to a counterclaim arising out of the same event which is the subject of the state's claim." *Maryland v. Hogg*, 311 Md. 446, 535 A.2d 923, 930 (1988); *see also* note 41, *infra* (discussing further the concept of waiver in

stated its intent more openly by enacting, in response to a supreme court decision which abrogated the Commonwealth's sovereign immunity,[38] a statute which specifically retains every vestige of Pennsylvania's immunity under the Eleventh Amendment. 42 Pa. Cons.Stat.Ann. § 8521(b).

. This leaves only the taxing authorities' conduct in the present bankruptcy cases as a possible declaration of express consent.[39] As this opinion is prepared, eight courts in the post-*Seminole* era have concluded that a state waives its Eleventh Amendment immunity when filing a proof of claim in the debtor's case. Three of these courts simply made blanket statements with little, if any, comment or authority. *See Sacred Heart Hosp. of Norristown v. Pennsylvania Dep't of Welfare (In re Sacred Heart Hosp. of Norristown)*, 199 B.R. 129, 135 (Bankr.E.D.Pa. 1996), *rev'd*, 204 B.R. 132 (E.D.Pa.1997); *In re Lush Lawns, Inc.*, 203 B.R. 418, 421 (Bankr.N.D.Ohio 1996); *Sparkman v. State of Fla. Dep't of Revenue (In re York–Hannover Devs., Inc.)*, 201 B.R. 137, 142 (Bankr. E.D.N.C.1996). Three others, though discussing the issue in slightly more depth, nevertheless relied on § 106(b) as directing that a waiver be found when a state files a proof of claim. *See California Employment Dev. Dep't v. Taxel (In re Del Mission Ltd.)*, 98 F.3d 1147, 1152 n. 6 (9th Cir.1996); *In re Martinez*, 196 B.R. 225, 229–30 (D.P.R.1996); *Schulman v. California State Water Resources Control Bd. (In re Lazar)*, 200 B.R. 358, 379 (Bankr.C.D.Cal.1996). Since I already have found § 106(b) unconstitutional to

the extent that it purports to revise Eleventh Amendment jurisprudence, this rationale must be rejected.

The two remaining cases, however, deserve more consideration. In *Headrick v. Georgia (In re Headrick)*, 200 B.R. 963 (Bankr. S.D.Ga.1996), Chapter 13 debtors filed an adversary complaint alleging that Georgia had violated the automatic stay by continuing to mail demand letters and collection notices after the petition had been filed. In *Burke v. Georgia (In re Burke)*, 200 B.R. 282 (Bankr. S.D.Ga.1996), discharged Chapter 7 debtors reopened their case to institute an action against Georgia for violating the discharge injunction. The same bankruptcy judge heard both matters and then issued opinions which contain almost identical language.

The court noted at the outset that Georgia, in both its constitution and its code, has refused to expressly waive its Eleventh Amendment immunity. *In re Headrick*, 200 B.R. at 967–68; *In re Burke*, 200 B.R. at 286–87. This finding, however, did not end the inquiry. The court observed that, although the Supreme Court had "not directly addressed whether a State waives its Eleventh Amendment immunity from suit in federal court by filing a proof of claim in a bankruptcy case," the Court had "ruled that creditors who file proofs of claim against a debtor's estate submit themselves to the bankruptcy court's equitable jurisdiction." *In re Headrick*, 200 B.R. at 968; *In re Burke*, 200 B.R. at 287. Since Georgia had submitted a proof of claim and triggered "the

---

Maryland). Such a waiver, however, is "limited to a counterclaim asserted defensively in recoupment, for the purpose of defeating or diminishing a state's recovery, but not to a counterclaim asserted for the purpose of obtaining an affirmative judgment." *Id.* Although this principle has no relevance here, I mention it in light of suggestions that § 106(b) and (c) may be "constitutionally applied to some counterclaims and setoffs asserted against state entities that file proofs of claim in bankruptcy cases." *See* S. Elizabeth Gibson, *Sovereign Immunity in Bankruptcy: The Next Chapter*, 70 Am.Bankr.L.J. 195, 210 (1996).

**38.** *Mayle v. Department of Highways*, 479 Pa. 384, 388 A.2d 709, 719 (1978). For an excellent discussion of the sovereign immunity question in Pennsylvania, *see* James J. Dodd and Martin A. Toth, *The Emperor's New Clothes: A Survey of*

*Significant Court Decisions Interpreting Pennsylvania's Sovereign Immunity Act and Its Waivers*, 32 Duq.L.Rev. 1 (1993).

**39.** Both the Maryland circuit court clerks (*see* Mem. in Supp. of Dismissal, Abstention, or Summ. J. and in Opp'n to Debtors' Mot. for Declaratory Relief at 13–15) and the Commonwealth of Pennsylvania (*see* Motion for Reconsideration at 2) asserted their Eleventh Amendment immunity early in these proceedings. It therefore is not necessary to consider whether a "general appearance" by such governmental units constitutes a waiver of their Eleventh Amendment immunity. *See Barfield v. Blackwood (In re Secretary of the Dep't of Crime Control and Pub. Safety)*, 7 F.3d 1140, 1148 n. 6 (4th Cir.1993), *cert. denied*, 511 U.S. 1109, 114 S.Ct. 2106, 128 L.Ed.2d 667 (1994).

process of allowance and disallowance of its claim," the State had subjected itself "to this court's equitable power" and thereby had waived its Eleventh Amendment immunity. *In re Headrick,* 200 B.R. at 968; *In re Burke,* 200 B.R. at 287. "If a state desires to participate in the assets of a bankrupt, she must submit to appropriate requirements by the controlling power; otherwise, orderly and expeditious proceedings would be impossible and a fundamental purpose of the Bankruptcy Act would be frustrated." *In re Headrick,* 200 B.R. at 969; *In re Burke,* 200 B.R. at 287.

Although there is some merit to the bankruptcy court's reasoning, I would not extend it so far. The Supreme Court decisions cited in *Headrick* and *Burke* involved "a creditor's right to jury trial under the Seventh Amendment to the United States Constitution." *In re Headrick,* 200 B.R. at 968; *In re Burke,* 200 B.R. at 287; *see Langenkamp v. Culp,* 498 U.S. 42, 111 S.Ct. 330, 112 L.Ed.2d 343 (1990); *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989). The bankruptcy court believed that the rationale [40] used in those Seventh Amendment cases "applies equally here." *In re Headrick,* 200 B.R. at 968; *In re Burke,* 200 B.R. at 287. To the contrary, those rulings focused only on *which* jurisdiction of the bankruptcy court a private party consents to when filing a proof of claim. At most, they can be read only as reaffirming the principle that personal jurisdiction is a legal right protecting the individual which may be waived. *See O'Brien v. R.J. O'Brien & Assocs., Inc.,* 998 F.2d 1394, 1399 (7th Cir.1993).

■ Whether a state waives its Eleventh Amendment immunity in bankruptcy has implications far beyond those contemplated in *Langenkamp* and *Granfinanciera.* Recognizing this fact, the Supreme Court has given great deference to the right of states to refuse the jurisdiction of the federal judiciary. Not only must any waiver be expressed

unambiguously, *Pennhurst II,* 465 U.S. at 99, 104 S.Ct. at 907, but the Court has held that a state may raise a defense predicated on the Eleventh Amendment at any time, even on appeal, *Edelman,* 415 U.S. at 677–78, 94 S.Ct. at 1362–63. I therefore am unwilling to conclude that the state's filing of a proof of claim constitutes a wholesale submission to the jurisdiction of the bankruptcy court as to any matter arising in or related to the debtor's case. Instead, the filing of a claim should at most be interpreted only as an express consent to the adjudication of that claim. *See Gardner v. New Jersey,* 329 U.S. 565, 574, 67 S.Ct. 467, 472, 91 L.Ed. 504 (1947). This holding comports more with the tendency of modern Eleventh Amendment jurisprudence to disfavor finding that a broad waiver has been effected.

Turning to our case, then, not all the taxing authorities filed proofs of claim. Prince George's County submitted (1) a claim in the NVHomes Limited Partnership case on May 14, 1992, for various real property taxes due for the 1992 fiscal year; (2) a claim in the Ryan Operations General Partnership case on September 9, 1992, for various real property taxes due for the 1991, 1992, and 1993 fiscal years; and (3) a second claim in the NVHomes Limited Partnership case on September 9, 1992, for various real property taxes due for the 1992 and 1993 fiscal years. On July 28, 1992, Howard County submitted a claim in the jointly administered case for water and sewer services and for various real property taxes due for the period beginning July 1, 1992, and ending June 30, 1993. The Commonwealth of Pennsylvania submitted (1) a claim for in the Ryan Operations General Partnership case on June 29, 1992, for sales, use, and hotel occupancy taxes; (2) a claim in the NVHolding case on June 18, 1992, for a capital stock franchise tax; and (3) a claim in the Ryan Financial Services case on March 4, 1993, for an employer withholding tax and a corporate net income tax.

---

**40.** The Court in *Granfinanciera* held that, even though the bankruptcy court generally conducts proceedings in equity, parties who had not filed a proof of claim in the case retained their Seventh Amendment right to a jury trial on "legal" causes of action. In *Langenkamp,* the Court ruled that

creditors who do file a proof of claim have no Seventh Amendment right to a jury trial since they have submitted themselves to a "restructuring of the debtor-creditor relationship through the bankruptcy court's *equitable jurisdiction."* *Langenkamp,* 498 U.S. at 44, 111 S.Ct. at 331.

■ Since Pennsylvania did not file a proof of claim in the debtors' cases for any real property transfer or recordation taxes, the Commonwealth cannot be bound by this court's order of April 4, 1996, under the theory of express waiver. The same might not be said, however, for the Maryland taxing authorities. With both Prince George's County and Howard County having included in their proofs of claim those state transfer taxes due during the period beginning April 6, 1992, and ending September 30, 1993, they at least facially appear to have waived their Eleventh Amendment immunity as to any adjudication of those claims. The only question left is whether those counties possessed the authority to effect such a waiver.

In *Jenkins v. Massinga*, 592 F.Supp. 480 (D.Md.1984), a class action suit was filed to recover a 5% surcharge imposed by the State of Maryland and Prince George's County on child support payments. The plaintiffs asserted that the State had waived its Eleventh Amendment immunity defense when its alleged agent, Prince George's County, had returned those fees still in the county purse. The court observed, however, that the plaintiffs had pointed to no statute by which the State had consented to such suits. Citing opinions issued by the Fourth Circuit Court of Appeals[41] and the Maryland Court of Appeals,[42] the court ruled that, "in the absence of statutory authorization, neither counsel for the State nor any of its agencies

may, 'either by affirmative action or by failure to plead the defense,' waive the defense of governmental immunity." *Id.* at 493.

Here, the proofs of claim for Prince George's County were filed by "Robert H. Rosenbaum, Attorney for Prince George's County, Maryland," and the proof of claim for Howard County was filed by "Raymond F. Servary, Jr., Director of Finance." The debtors have highlighted no law operative in Maryland, however, which would authorize either these persons, in their individual or representative capacities, or the counties proper to waive the immunity from suit guaranteed by the Eleventh Amendment. *See Sosna v. Iowa*, 419 U.S. 393, 396 n. 2, 95 S.Ct. 553, 556 n. 2, 42 L.Ed.2d 532 (1975) (indicating that courts must find authority for such a waiver in state law). Moreover, the debtors have proffered no basis for finding that these individuals or counties have been empowered to waive any constitutional immunity enjoyed by the circuit court clerks for those counties.[43] I therefore hold that the filing of these proofs of claim does not preclude the circuit court clerks for Prince George's County and Howard County from invoking the Eleventh Amendment in this case.

## VI.

In light of this opinion, then, the court will amend the April 4, 1996, order so that it does

---

**41.** The decision in *Linkenhoker v. Weinberger*, 529 F.2d 51 (4th Cir.1975), relied heavily on a Maryland law which forbade the judiciary from construing an appearance by the Attorney General as a waiver of the common law sovereign immunity enjoyed by any arm of the State. That provision remains on the statute books, re-codified at Md.Code Ann., State Gov't § 12–306(b).

**42.** *Charles E. Brohawn & Bros., Inc. v. Board of Trustees of Chesapeake College*, 269 Md. 164, 304 A.2d 819 (1973).

**43.** No court in a bankruptcy case has decided whether one agency's waiver of its immunity under the Eleventh Amendment will effect a waiver of the constitutional immunity enjoyed by all the agencies of that state. Instead, the opinions have focused on whether all the agencies of a state constitute one "governmental unit" under §§ 106(b) and (c). *See William Ross, Inc. v. Biehn Constr., Inc. (In re William Ross, Inc.)*, 199 B.R. 551, 554–56 (Bankr.W.D.Pa.1996).

Outside the context of a bankruptcy, at least one district court has held that "the fact that two state agencies in this case have waived their immunity with regard to the claims against them does not require [another] agency to consent to suit for the claims against it. Each state agency is a separate defendant in this action, and each may choose whether to remove the cloak of Eleventh Amendment immunity." *National R.R. Passenger Corp. v. Rountree Transp. & Rigging, Inc.*, 896 F.Supp. 1204, 1207 (M.D.Fla.1995); *but see New Jersey Dep't of Envtl. Protection v. Gloucester Envtl. Management Servs., Inc.*, 923 F.Supp. 651, 664 (D.N.J.1996) (noting that "[t]he State colleges and hospitals cannot in one breath claim to be the alter egos of the State and as such entitled to share in all of the State's immunities, and in the next breath argue, in effect, that they are not the same State which filed the suit in the first place, albeit through a different State agency").

not bind either the Commonwealth of Pennsylvania or the Maryland circuit court clerks as collectors of the state transfer tax. A separate order will be entered.

### ORDER

On September 18, 1996, the court held a hearing on motions filed by taxing authorities in Pennsylvania and Maryland asking the court to reconsider and to amend a declaratory judgment order entered April 4, 1996. The court then took the matter under advisement. For the reasons set forth in the memorandum opinion accompanying this order, the court will grant the taxing authorities' motion in part.

IT IS THEREFORE ORDERED that the transfers of real property by or to the debtors from April 6, 1992, through September 30, 1993, as identified and set forth on exhibits 4, 6, and 7 to the memorandum in support of the debtors' motion for declaratory judgment, were exempt from transfer and recordation taxes pursuant to 11 U.S.C. § 1146(c), and

IT IS FURTHER ORDERED that this order shall not bind the Maryland circuit court clerks as collectors of the state transfer tax or the Commonwealth of Pennsylvania, and

IT IS FURTHER ORDERED that this order shall supersede and supplant the order granting the debtors' motion for declaratory judgment and denying the taxing authorities' motions to abstain, dismiss or for summary judgment entered April 4, 1996, only to the extent that the order entered April 4, 1996, (a) relied upon the debtors' proposed conclusions of law on the issue of sovereign immunity and (b) was binding upon the Maryland circuit court clerks as collectors of the state transfer tax or upon the Commonwealth of Pennsylvania.