**In re Michael Scott ROSE and Jennifer Ruth Rose, Debtors.**

**Jennifer R. ROSE, Plaintiff,**

**v.**

**U.S. DEPT. OF EDUCATION; Coordinating Board for Higher Education; Student Loan Program; University of Missouri; Hemar Insurance Corporation of America; Illinois Guarantors Student Asst.; Nebraska Student Loan; and North Star Guarantee, Defendants.**

Bankruptcy No. 97–42803–2.

Adversary No. 97–4120–2.

United States Bankruptcy Court, W.D. Missouri.

Dec. 19, 1997.

Jennifer Ruth Bragg Rose, Independence, MO, Pro se.

Michael Scott Rose, Independence, MO, Pro se.

John Lewis, Jr., Kansas City, MO, trustee.

## ORDER

FRANK W. KOGER, Chief Judge.

Debtor Jennifer R. Rose filed a Complaint to determine the dischargeability of student loans which she owes to the above-named defendants. Defendant North Star Guarantee failed to answer the Complaint and default judgment was entered against it. The University of Missouri filed a Motion to Dismiss the Complaint on the ground that the debtor's claim against it is barred by the Eleventh Amendment to the United States Constitution. That Motion was granted by Order entered November 10, 1997. This Court now considers the nondischargeability of the other defendants' claims under § 523(a)(8)(B).[1]

### Waiver of Sovereign Immunity

In its November 10 Order, this Court followed the line of cases applying *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 53–54, 116 S.Ct. 1114, 1122, 134 L.Ed.2d 252 (1996), holding that § 106(a) is unconstitutional and ineffective in abrogating the states' sovereign immunity. As a result, this Court held that because the University of Missouri was a state agency and did not perform any act which would constitute waiver of its immunity, the adversary action against it had to be dismissed.

---

**1.** Unless otherwise indicated, statutory references are to the United States Bankruptcy Code, 11 U.S.C. §§ 101 through 1330.

In contrast, while the Missouri Student Loan Program ("MSLP") adequately established it was a government agency entitled to Eleventh Amendment protection, it had filed proofs of claim in the debtors' bankruptcy case, which Debtors asserts caused it to waive its Eleventh Amendment sovereign immunity. Section 106(b) provides that "a governmental unit that has filed a proof of claim in the case is deemed to have waived sovereign immunity with respect to a claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which the claim of such governmental unit arose." Debtors asserted that because MSLP and all of the other remaining defendants filed proofs of claim in the bankruptcy case, pursuant to § 106(b), they had all waived any possible claim of sovereign immunity.

As a result, and because the issue of sovereign immunity is jurisdictional, this Court directed that any remaining defendant who wished to assert a sovereign immunity claim should file a brief addressing (1) the source of law providing that the particular defendant was a state agency and (2) the very narrow issue of whether, under § 106(b), a state waives its Eleventh Amendment sovereign immunity by filing a proof of claim in a bankruptcy case. Debtors were also allowed to brief the issue.

The only defendant to file a brief was MSLP, who, as mentioned, had raised the issue and filed a Motion to Dismiss prior to the November 10 Order. None of the other defendants have responded and therefore, the Court concludes that they have not established they are entitled to Eleventh Amendment protection. *Accord In re NVR L.P.,* 206 B.R. 831, 846 (Bankr.E.D.Va.1997) (holding that since some of the defendants had not filed any brief or pleading providing any evidence as to whether they are an arm of the state, the Eleventh Amendment did not apply to them).

Since the Supreme Court's decision in *Seminole,* several courts have addressed, under varying degrees of discussion and analysis, the issue regarding whether filing a proof of claim constitutes waiver of sovereign immunity, many holding (under different theo-

ries) that a state who files a proof of claim in a bankruptcy case has waived its sovereign immunity. *See e.g., In re Martinez,* 196 B.R. 225, 229–30 (D.P.R.1996); *Sacred Heart Hosp. of Norristown v. Pennsylvania Dep't of Welfare (In re Sacred Heart Hosp. of Norristown),* 199 B.R. 129, 135 (Bankr. E.D.Pa.1996), *rev'd,* 204 B.R. 132 (E.D.Pa. 1997), *Schulman v. California State Water Resources Control Bd. (In re Lazar),* 200 B.R. 358, 379 (Bankr.C.D.Cal.1996); *Sparkman v. State of Fla. Dep't of Revenue (In re York–Hannover Devs., Inc.),* 201 B.R. 137, 142 (Bankr.E.D.N.C.1996); *In re Lush Lawns, Inc.,* 203 B.R. 418, 421 (Bankr. N.D.Ohio 1996); *California Employment Dev. Dep't v. Taxel (In re Del Mission Ltd.),* 98 F.3d 1147, 1152 n. 6 (9th Cir.1996); *Wyoming Dep't of Transp. v. Straight (In re Straight),* 209 B.R. 540, 555–58 (D.Wyo.1997); *AER–Aerotron, Inc. v. Texas Dep't of Transp.,* 104 F.3d 677 (4th Cir.1997); *In re Fennelly,* 212 B.R. 61, 64 (D.N.J.1997).

This Court, however, agrees with the reasoning of the recent cases which have held that § 106(b) must be found to be unconstitutional to the extent it attempts to dictate the circumstances constituting a waiver of immunity on the part of a state. *See In re NVR L.P.,* 206 B.R. 831, 851 (Bankr.E.D.Va.1997); *In re C.J. Rogers, Inc.,* 212 B.R. 265 (E.D.Mich.1997); *In re Creative Goldsmiths of Washington, D.C.,* 119 F.3d 1140, 1147–48 (4th Cir.1997).

According to the court in *In re NVR:*

The subject for any waiver, however, must be the state rather than Congress. In other words, while Congress may "abrogate," only a state may "waive" its Eleventh Amendment immunity. It is simply impossible for Congress, through [subsections (b) and (c)], to have served as a proxy for the states and dictated those circumstances in which the states would "waive" their prerogative under the Amendment.

206 B.R. at 839. Furthermore,

since "[i]t is emphatically the province and the duty of the judicial department to say what the law is," [*Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803) ], Congress cannot dictate to the judiciary the standard for assessing wheth-

er a state has waived its Eleventh Amendment immunity. This begins and ends as a matter of constitutional interpretation. *Id.* As a result, to the extent Congress undertook in § 106(b) to displace or modify the meaning ascribed to the Eleventh Amendment by the courts, its endeavor must be deemed an attempted abrogation of the states' constitutional immunity. *Id.* "[W]hether Congress says 'abrogate' or 'deem to be waived' it clearly intends abrogation because either phrase has the same substantive and practical effect, namely Congress alone is determining when States will be subject to suit." *In re C.J. Rogers,* 212 B.R. at 271.

Thus, § 106(b) must fall with § 106(a). *See In re NVR,* 206 B.R. at 839. This is true because Congress acted under the same invalid authority when it enacted all of § 106. *See In re C.J. Rogers,* 212 B.R. at 273 (finding § 106(b) to be invalid as unconstitutional on the ground that Congress did not enact that section pursuant to any valid power). "Simply put, the Eleventh Amendment and the Supreme Court's decision in *Seminole Tribe of Florida* demand that this Court recognize that under any Article I power Congress can neither abrogate nor deem to be waived the States' sovereign immunity." *C.J. Rogers,* 212 B.R. at 273 (*citing In re Creative Goldsmiths of Washington, DC., Inc.,* 119 F.3d 1140 (4th Cir.1997)).

Nevertheless, that conclusion does not end the enquiry as to the issue of whether, by filing a proof of claim, MSLP waived its sovereign immunity. In other words, even assuming Congress cannot mandate when a state waives its sovereign immunity and § 106(b) is therefore invalid, this Court must still determine, independently of § 106(b), whether a state's actions constitute a waiver of its Eleventh Amendment sovereign immunity. As the Fourth Circuit indicated in *In re Creative Goldsmiths,* § 106(b) may have correctly described those actions which, as a matter of constitutional law, constitute a state's waiver of the Eleventh Amendment, 119 F.3d at 1147, but it is for the court to determine whether that has, in fact, occurred.

A state can waive its sovereign immunity if it consents to be sued in federal court. *See In re NVR,* 206 B.R. at 849; *In re C.J. Rogers,* 212 B.R. at 273. However, constructive consent is not a doctrine commonly associated with the surrender of constitutional rights; therefore, a state's waiver of its Eleventh Amendment immunity will be given effect "only where stated by the most express language or by such overwhelming implication from the text as [will] leave no room for any other reasonable construction." *See In re NVR,* 206 B.R. at 849 (*quoting Edelman v. Jordan,* 415 U.S. 651, 673, 94 S.Ct. 1347, 1361, 39 L.Ed.2d 662 (1974); other citations omitted). In other words, the consent must be "unequivocally expressed" and will be strictly construed. *Id.* (*citing Pennhurst State Sch. & Hosp. v. Halderman (Pennhurst II),* 465 U.S. 89, 99, 104 S.Ct. 900, 907, 79 L.Ed.2d 67 (1984); *Lelsz v. Kavanagh,* 807 F.2d 1243, 1253 (5th Cir. 1987), *cert. dismissed* 483 U.S. 1057, 108 S.Ct. 44, 97 L.Ed.2d 821 (1987)).

On the point of voluntary waiver, this Court finds the reasoning of *In re C.J. Rogers,* 212 B.R. 265, particularly convincing. As in that case, because the State of Missouri appears not to have waived its sovereign immunity to suits in federal court by declaration or legislation, nor has it participated as a plaintiff or intervenor in this federal lawsuit, we look to *Gardner v. State of New Jersey,* 329 U.S. 565, 571, 67 S.Ct. 467, 470, 91 L.Ed. 504 (1947), which the *In re C.J. Rogers* court described as the controlling precedent on the waiver of sovereign immunity in bankruptcy proceedings. *In re C.J. Rogers,* 212 B.R. at 274.

As the *In re C.J. Rogers* court summarized:[2] in *Gardner,* the State of New Jersey filed a claim for unpaid taxes against the debtor. Faced with objections to claim by other creditors, the State contended that a determination of the amount or priority of its claim would constitute an impermissible suit against it as a sovereign. In finding that the priority and amount of the State's tax lien

---

**2.** 212 B.R. at 274.

was within the jurisdiction of the Bankruptcy Court, the Supreme Court observed that:

[i]t is traditional bankruptcy law that he who invokes the aid of the bankruptcy court by offering a proof of claim and demanding its allowance must abide the consequences of that procedure. If the claimant is a State, the procedure of proof and allowance is *not transmitted into a suit against the State* because the court entertains objections to the claim. *The State is seeking something from the debt-or. No judgment is sought against the State. The whole process of proof, allowance, and distribution is, shortly speaking, an adjudication of interests claimed in a res.* It is none the less such because the claim is rejected in toto, reduced in part, given a priority inferior to that claimed, or satisfied in some way other than payment in cash. When the State becomes the actor and files a claim against the fund it waives any immunity which it otherwise might have had respecting the adjudication of *the claim.*

*Gardner,* 329 U.S. at 573–74, 67 S.Ct. at 472; *In re C.J. Rogers,* 212 B.R. at 274 (emphasis added by the *C.J. Rogers* court). "Under the plain language of Gardner, it seems that, in the absence of § 106, when a State files a proof of claim in a bankruptcy proceeding, the State only waives its sovereign immunity with respect to the adjudication of that particular claim, otherwise the adjudication of the State's claim would be 'transmitted into a suit against the State' for monetary damages which would violate the principle that '[n]o judgment is sought against the State.'" *In re C.J. Rogers,* 212 B.R. at 274; *accord In re NVR,* 206 B.R. at 851 ("the filing of a claim should at most be interpreted only as an express consent to the adjudication of that claim").[3]

MSLP essentially concedes the conclusion reached in *In re C.J. Rogers* and *In re NVR,* but asserts it does not apply in the case of an adversary proceeding such as this one. MSLP asserts that by filing a proof of claim, only the claims allowance process is triggered; thus, by filing a proof of claim, the state agrees only to allow the bankruptcy court to determine the amount, validity and priority of the claim. It does not agree to have the dischargeability of that claim adjudicated.

A Fourth Circuit case, *In re Creative Goldsmiths,* 119 F.3d at 1148–49, is instructive on this issue. In that case, the State of Maryland had filed a proof of claim for sales taxes and withholding taxes in the debtor's bankruptcy case. The trustee then brought an action against the State of Maryland to avoid as a preference the debtor's pre-petition payment of income taxes. The State of Maryland asserted on appeal that in light of *Seminole,* it was entitled to an Eleventh Amendment immunity defense as to the trustee's preference action against it.

The Fourth Circuit started by noting that in the absence of a specific state statute waiving the state's immunity, a state can do so by voluntarily entering an action in federal court. *In re Creative Goldsmiths,* 119 F.3d at 1147. According to the Fourth Circuit:

The Eleventh Amendment, which applies only to suits "commenced or prosecuted against one of the United States," presents no bar to a state affirmatively entering a federal forum voluntarily to pursue its own interest. But it would violate the fundamental fairness of judicial process to allow a state to proceed in federal court and at the same time strip the defendant of valid defenses because they might be construed

**3.** Two other cases, *Headrick v. Georgia (In re Headrick),* 200 B.R. 963 (Bankr.S.D.Ga.1996), and *Burke v. Georgia (In re Burke),* 200 B.R. 282 (Bankr.S.D.Ga.1996), relied on *Langenkamp v.. Culp,* 498 U.S. 42, 111 S.Ct. 330, 112 L.Ed.2d 343 (1990), and *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989), (which involved a creditor's Seventh Amendment right to a jury trial) and held that by filing a proof of claim, a state subjects itself to the bankruptcy court's equitable power and thereby waives its Eleventh Amendment immuni-

ty. Although they are instructive here, this Court agrees with the *In re NVR* court which said *Langenkamp* and *Granfinanciera* were distinguishable in that they focused only on which jurisdiction of the bankruptcy court a private party consents to when filing a proof of claim. Thus, the *In re NVR* court declined to extend those cases so far as to support a finding of waiver of Eleventh Amendment immunity, and this Court agrees with that conclusion. *Accord In re C.J. Rogers,* 212 B.R. at 275–76.

to be affirmative claims against the state. When a state authorizes its officials voluntarily to invoke federal process in a federal forum, the state thereby consents to the federal forum's rules of procedure and may not invoke sovereign immunity to protect itself against the interposition of defenses to its action. The scope of these available defenses and the state's concomitant waiver of immunity is a question of federal law and procedure, but well-established principles of sovereign immunity dictate that this waiver be narrowly construed. *See e.g., Atascadero,* 473 U.S. at 239–40, 105 S.Ct. at 3146. For this reason, we hold that to the extent a defendant's assertions in a state-instituted federal action, including those made with regard to a state-filed proof of claim in a bankruptcy action, amount to a compulsory counterclaim, a state has waived any Eleventh Amendment immunity against that counterclaim in order to avail itself of the federal forum. *Id.* at 1148.

In that case, because the taxes which the trustee sought to avoid as preferential were unrelated to the taxes which were claimed by the state in the proof of claim, the trustee's action could not be construed as a compulsory counterclaim because they did not arise out of the same transaction or occurrence. *Id.* at 1149; Fed.R.Bankr.P. 7013.

However, the Fourth Circuit indicated by this holding that if the taxes sought by the trustee had been the same as those claimed by the state in the proof of claim, then that would have amounted to a compulsory counterclaim (arising out of the same transaction or occurrence) and in such a case, the filing of the proof of claim would have constituted a valid waiver of immunity as to issues related to that claim, including a preference action.[4]

■ Under the Fourth Circuit's reasoning, then, because the student loans which

the debtors herein seek to have discharged are the same as the ones claimed by MSLP in its proof of claim, they certainly arose out of the same transaction or occurrence, and thus, the action to determine dischargeability is akin to a compulsory counterclaim to MSLP's proof of claim. As such, by filing the proof of claim, MSLP consented to this Court's adjudication of the claim and thus waived its immunity as to that claim.

Moreover, by filing its claim, MSLP was certainly asserting that the claim should be allowed, and certainly hoped (and perhaps expected) that the claim would be found to be nondischargeable as a student loan. From an equity standpoint, MSLP cannot have it both ways: if it entered the proceeding anticipating favorable results regarding its claim (i.e., nondischargeability), it must also be subject to potentially unfavorable results as to that claim (i.e., dischargeability).

Finally, MSLP asserts that if the act of filing a proof of claim constitutes a waiver of sovereign immunity, its filing proofs of claim in this case cannot be construed as such a waiver because neither it nor its agent who filed the proofs of claim have the authority to waive sovereign immunity on behalf of the State of Missouri. MSLP cites *In re NVR* in support.

In *In re NVR,* the debtors had moved the court for an order requiring the States of Maryland and Pennsylvania to refund certain real estate taxes which had been collected by those states in contravention of the confirmed plan of reorganization. The State of Pennsylvania had not filed a proof of claim, so it could not be found to have expressly waived its immunity. The State of Maryland, on the other hand, had filed proofs of claim. Specifically, the proofs of claim were filed by the "Attorney for Prince George County, Maryland" and the "Director of Finance" of Howard County, Maryland. Be-

---

4. The District Court for the Eastern District of Michigan came to the same conclusion in *In re C.J. Rogers.* After discussing what would constitute a cognizable counterclaim to a state's claim, 212 B.R. at 274–75, the court concluded that because the trustee's preference action for certain taxes was "not part of adjudicating the proofs of claim that the [state agency] filed," (the state's proof of claim was for different taxes than

those sought by the trustee) the state agency had not consented to resolution of the preference action. 212 B.R. at 276. Thus, the Court inferred (if not outright stated) that if the preference action had been a cognizant counterclaim, the filing of the proof of claim would have constituted express waiver of immunity as to the preference action as well.

cause the debtors cited no Maryland law which would authorize either of those persons, in their individual or representative capacities, or the counties proper to waive Eleventh Amendment immunity, the Bankruptcy Court for the Eastern District of Virginia held that the filing of the proofs of claim did not preclude the circuit court clerks for the two counties from invoking the Eleventh Amendment in that case. *In re NVR*, 206 B.R. at 852.

While *In re NVR's* analysis on this point appears to be correct, this Court agrees with the further analysis, discussed more fully above, performed by the Fourth Circuit in *In re Creative Goldsmiths*, 119 F.3d 1140, which was decided just a few months after *In re NVR*. In that case, like the court in *In re NVR*, the Fourth Circuit also came to the conclusion that Maryland law did not provide authority for the state agent (the Attorney General in that case) to waive Maryland's Eleventh Amendment immunity by defending the case on the merits in the district court. *Id.* at 1149.

However, as discussed above, the Fourth Circuit went on to discuss the issue of whether a state's filing a proof of claim constituted waiver of "compulsory counterclaims" (claims arising out of the same transaction or occurrence) to the proof of claim. Again, the Fourth Circuit concluded in *In re Creative Goldsmiths* that because the preferential taxes did not arise out of the same transaction or occurrence as the taxes asserted in the proof of claim, there was no waiver, thereby implying that if they had arisen from the same transaction or occurrence, the filing of the proof of claim would have constituted a valid waiver of Maryland's Eleventh Amendment immunity as to that claim. Thus, even though the party who filed the proof of claim did not have the authority to expressly waive the state's immunity, he or she was able, by filing a proof of claim, to consent to the adjudication of that claim. If the preference action in that case had arisen out of the same transaction or occurrence, the proof of claim would have effected a waiver as to that preference action.

Likewise, in the case at bar, Debtors have cited no Missouri law indicating that MSLP

or its agent has authority to waive Eleventh Amendment immunity. However, MSLP does not dispute that its agents who filed the proofs of claim had the authority to perform that action of behalf of the state. Under the reasoning of *In re Creative Goldsmiths*, this Court finds that although MSLP or its agents did not have the authority to waive the State of Missouri's Eleventh Amendment immunity in any sense beyond the adjudication of those claims, they did have the authority to consent to the adjudication of those claims, which, as discussed above, includes this adversary to determine dischargeability of those claims.

The language used by the United States Supreme Court in *Gardner*, quoted above, supports this conclusion and bears repeating:

> [i]t is traditional bankruptcy law that he who invokes the aid of the bankruptcy court by offering a proof of claim and demanding its allowance must abide the consequences of that procedure.... It is none the less such because the claim is rejected in toto, reduced in part, given a priority inferior to that claimed, or satisfied in some way other than payment in cash. When the State becomes the actor and files a claim against the fund it waives any immunity which it otherwise might have had respecting the adjudication of the claim.

*Gardner*, 329 U.S. at 573–74, 67 S.Ct. at 472; *In re C.J. Rogers*, 212 B.R. at 274.

As a result, this Court finds that by filing its proofs of claim in the debtors' bankruptcy case, MSLP waived any Eleventh Amendment immunity defense as to those claims. Its Motion to Dismiss the adversary Complaint against it is therefore denied.

Consequently, the Court must now determine whether the student loans owed to the remaining defendants, including MSLP, are nondischargeable under § 523(a)(8) which excepts student loans from dischargeability.

*Undue Hardship under § 523(a)(8)(B)*

The evidence at trial showed that Jennifer Rose obtained student loans, amounting to some $105,000, during the course of her college and law school education. She obtained her law degree in 1995 and now works as a

law clerk for the Jackson County Associate Circuit Court earning just over $30,000 per year. Michael Rose is not gainfully employed but instead stays home to care for the debtors' two young children. As the forebearances on the student loans were about to run out, and realizing they could not make the payments on them under their current situation, the debtors filed their petition in bankruptcy and now seek to have Jennifer's student loans declared dischargeable under § 523(a)(8)(B).

■  Section 523(a)(8) provides:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

   *     *     *     *     *     *

(8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for any obligation to repay funds received as an educational benefit, scholarship or stipend, unless—

(A) such loan, benefit, scholarship, or stipend overpayment first became due more than 7 years (exclusive of any applicable suspension of the repayment period) before the date of the filing of the petition; or

(B) excepting such debt from the discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents.

The Code does not define undue hardship, so it is in the discretion of the bankruptcy court to determine if the facts of a particular case warrant a finding of dischargeability of the debt. *In re Dotson–Cannon*, 206 B.R. 530, 533 (Bankr.W.D.Mo.1997); *Andrews v. South Dakota Student Loan Assistance Corp. (In re Andrews)*, 661 F.2d 702, 704 (8th Cir. 1981).

■  This Court utilizes the test set out in *Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395 (2d Cir.1987), under which a debtor can show undue hardship for purposes of § 523(a)(8)(B) if she can show (1) the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) debtor has made good faith efforts to repay the loans. *Brunner,* 831 F.2d at 396. Debtors must prove each of these three elements.

■  Applying the *Brunner* test to the case at bar, as to the first prong, the evidence showed that Jennifer Rose's net income from her employment is roughly $1,748.00 per month.[5] As mentioned, Michael Rose is not employed, so this figure represents the couple's total monthly income. The debtors have the following monthly expenses:

| | |
|---|---:|
| Rent | $ 625.00 |
| Electricity and gas | 125.00 |
| Water and sewer | 35.00 |
| Telephone | 40.00 |
| Trash | 10.00 |
| Home maintenance | 20.00 |
| Food (including diapers and formula) | 450.00 |
| Clothing | 100.00 |
| Laundry and dry cleaning | 10.00 |
| Medical and dental expenses | 50.00 |
| Transportation (gas, repairs & upkeep) | 100.00 |
| Auto insurance | 67.00 |
| Personal property tax on cars | 20.00 |
| Car payments (2 cars) | 278.00 |
| Bar and CLE fees (Jennifer) | 50.00 |
| Total Monthly Expenditures | $1,819.00 [6] |

Of course this total does not include the credit card payments or the student loans which Debtors have sought to have discharged. In any event, this leaves the debtors with a monthly deficit of $71.00. As a result, based on the current income and ex-

**5.** This figure comes from the Schedule I which was filed with the bankruptcy petition. It was based on Jennifer's salary which was roughly $27,000 at that time. She testified she now makes a little over $30,000, but since she will operate at a deficit or near deficit under either figure, the Court will use the figures contained in the schedules.

**6.** Debtors prepared an "Amended List of Expenditures" for trial which indicated their expenses were $2,073.00, leaving them with a monthly deficit of $325.00. As with the different income figures, it makes no difference which set of figures are used for these purposes because under either calculation, Debtors operate at or near a deficit each month.

penses of the debtors and their family, the debtors clearly cannot afford to make the monthly payments on the student loans while still maintaining a minimal standard of living for their family.

Although several of the creditors have suggested that some of the listed items are not necessary for a minimal standard of living (such as the second car for Michael who is not working and the seemingly high rent payment), the Court finds the expenditures as a whole are not excessive. Any apparent overage in one category is offset by other categories which seem too small or are missing altogether. For example, the debtors have listed nothing for entertainment, recreation, magazines, newspapers, or charitable contributions. In fact, the debtors state that although they attend the Temple to which Michael belonged as a child, they cannot afford to join the Temple because it costs $150.00 per year to do so.

In its Order dated November 10, 1997, this Court found that the Complaint as to the University of Missouri had to be dismissed because it enjoyed sovereign immunity under the Eleventh Amendment and did not waive its immunity by filing a proof of claim or otherwise. As a result, in addition to the above-listed expenses, the debtors will also be required to repay that student loan, in the amount of roughly $6,360, making their monthly deficit even greater.

In sum, although the Court shares many of the creditors' frustrations with the debtors' attitudes regarding their financial situation, the Court finds that the debtors have sufficiently proven the first prong of the *Brunner* test, namely, that based on their current income and expenses, they cannot maintain a minimal standard of living for themselves and the children if they are forced to repay the remaining student loans.

Under the *Brunner* test, the debtors are next required to prove that their situation is likely to persist for a significant portion of the loan repayment period. Again, the creditors and the Court are frustrated with the fact that the debtors' shortfall each month is unquestionably caused by the fact that Michael does not work. The debtors presented some tenuous evidence that Michael has had a back problem, but the parties eventually admitted that the back problem was not the real reason he was not working outside the home.[7] Essentially, the parties concede he is staying at home to care for the children because any income he could realistically earn from any employment would be at least offset by child care costs.

Debtors' evidence supports the contention that Michael cannot make enough money to pay the child care costs which would be incurred if he went back to work. The creditors have suggested alternative solutions (such as Michael taking a night job while Jennifer stays with the children), but there has been no evidence that Michael can earn more than minimum wage, and clearly some child care and additional expenses would have to arise. As a result, the Court finds that the situation is likely to persist at least until the youngest child is in full-day school, which should be in six years.[8]

As the creditors point out, the reasonable prospect of enhanced income is a significant factor to be considered in determining the likelihood that the situation will persist, and since both of the debtors' children will be in school within six years, there is a very good prospect of increased income at that time. Debtors conceded that there is no reason why Michael cannot get a job when the children go to school. Although the evidence showed Michael could probably not make more than $900—1,000 per month, this should increase the couple's income relatively substantially and the creditors assert this additional income could be applied to their debts.

---

**7.** The testimony regarding Michael's back injury was very vague, but it appears as though he injured his back as a teenager and made a few visits to a doctor for that injury. Since then, he has had difficulty lifting heavy objects. No doctor has diagnosed Michael with a permanent back injury or a disability and he has not sought treatment from anyone for his back in several years. He also testified that although he cannot carry his 30–pound daughter for long periods of time, he has been pain-free for several years.

**8.** The youngest child was born while this case was pending.

However, the typical repayment period for student loans is ten years. *See Wardlow v. Great Lakes Higher Educ. Corp. (In re Wardlow)*, 167 B.R. 148, 152 n. 5 (Bankr. W.D.Mo.1993); *Bey v. Dollar Savings Bank (In re Bey)*, 95 B.R. 376, 378 (Bankr.W.D.Pa. 1989). This leaves four years (of the typical repayment period) after Michael can return to work for the debtors to repay roughly $100,000 in student loans, plus the interest which will accrue at roughly 8% over six years.

Moreover, as mentioned above, the debtors currently operate at a monthly deficit and the Court has already ruled that $6,360 of Jennifer's student loans will have to be repaid because that debt is nondischargeable. Those payments were not even included in the income-expense calculation above. Consequently, as a result of that decision, the debtors will be required to either obtain additional deferments from the University of Missouri (and will then owe a large sum to them at the end of the deferment period), or they are going to continue to fall further and further behind on their monthly payments on all their other obligations.

As a result, without even considering these other remaining student loans, at the end of six years, the debtors will again be in a position of facing a very significant debt load. Furthermore, although the creditors suggest Jennifer is not maximizing her earning potential and could very possibly obtain a higher-paying job with her law degree, this Court is not convinced that is true, particularly in light of the fact that it is widely recognized that the market for new attorneys today is very tight. Moreover, based on Jennifer's presentation of this case, this Court considers it unlikely that she will obtain more lucrative employment in the foreseeable future.

Consequently, the Court finds that the second prong of the *Brunner* test has been met: the debtors' inability to pay these student loans while maintaining a minimal standard of living for their family is likely to persist for the next ten years.

Finally, under the *Brunner* test, the debtors must show they have made a good faith effort to repay the student loans. A good faith effort is measured by the debtor's efforts to obtain a well-paying job, maximize income, and minimize expenses. *In re O'Brien*, 165 B.R. 456, 459 (Bankr.W.D.Mo. 1994) (*citing In re Roberson*, 999 F.2d 1132, 1136 (7th Cir.1993)). Attempts to repay the student loans are another indicator of good faith. *In re Dotson–Cannon*, 206 B.R. at 535.

Again, although the Court shares the creditors' frustration with Michael Rose's employment situation, the reality is that the cost of child care will be greater than his income. As a result, his unemployment cannot be considered as a factor of good faith. The Court is likewise convinced that Jennifer Rose has made reasonable efforts to obtain the best job she can.

Furthermore, the court is convinced that the parties have made reasonable efforts to minimize their expenses. Jennifer drives a 1990 Pontiac Sunbird with over 100,000 miles and Michael drives a 1986 Nissan with over 110,000 miles. These are not lavish vehicles. The parties testified they never eat out (except to take the kids to McDonalds now and then) and that they never go out for entertainment. Although they list a monthly clothing expense of $100, they testified that most of that goes to clothing the growing children and Jennifer's work clothes requirements, particularly in light of the fact that she has just had a baby and her clothes no longer fit her. Finally, although the debtors could perhaps find housing slightly less expensive than the $625 per month they are now paying, $625 per month is not excessive rent for a family of four. Both vehicles need repair and both Jennifer and Michael need extensive dental work which they cannot afford. In sum, the Court is convinced that the debtors have attempted to minimize expenses.

Of course the defendants have pointed out that the debtors have made no payments on the student loans, and the Court agrees that this fact would tend to negate any argument of good faith. However, since the debtors were operating at a deficit in the first place, there was no money to make such an attempt to pay the student loans. "[T]he mere failure to make minimal payments on a student loan does not prevent a finding of good faith where the debtor never had the resources to

make payments." *In re Clevenger*, 212 B.R. 139, 146 (Bankr.W.D.Mo.1997) (*quoting Courtney v. Gainer Bank (In re Courtney)*, 79 B.R. 1004, 1011 (Bankr.N.D.Ind.1987)). "Therefore, the debtor's good faith takes into account her ability to pay, not just the fact of whether payment is made." Id. Because the policy behind this test is that a debtor may not willfully or negligently cause her own default, but rather conditions must result from factors beyond [her] reasonable control, the debtor's efforts to pay must be examined in light of the environment in which they occur. *Id.* (*quoting In re Roberson*, 999 F.2d 1132, 1136 (7th Cir.1993)). Despite the fact that the debtors were operating at a monthly deficit and therefore could afford to pay nothing on Jennifer's student loans, Jennifer Rose testified that she researched the possibility of consolidating her loans and/or going on a payment plan which would require lesser payments now and higher payments later, but none of the options presented anywhere near a feasible payment schedule. In light of this, the Court finds that the debtors have satisfied the good faith requirement in *Brunner*.

In sum, although the Court has a strong visceral feeling that a debtor should not accumulate over $100,000.00 in student loans, thereby financing her entire undergraduate and legal education, and then escape those obligations through the mechanism of Chapter 7, the Court finds that the debtors have sufficiently satisfied the *Brunner* test for establishing hardship under § 523(a)(8)(B). The debts to Defendants U.S. Department of Education, the Coordinating Board for Higher Education, the Missouri Student Loan Program, HEMAR Insurance Corporation of America, Illinois Guarantors Student Asst., Nebraska Student Loan, and North Star Guarantee [9] are DISCHARGED. Of course, as previously stated, the University of Missouri loans are not discharged by virtue of the November 10, 1997 Order.

9. As mentioned above, default judgment was entered against Defendant North Star Guarantee by previous order.