In re Michael S. ROSE and Jennifer R. Rose, Debtors.

UNITED STATES DEPARTMENT OF EDUCATION, Coordinating Board for Higher Education, Missouri Student Loan Program, Illinois Student Assistance Commission, Nebraska Student Loan Program, and United Student Aid Funds, Inc., Defendants/Appellants,

v.

Jennifer R. ROSE, Plaintiff/Appellee.

No. 98–0267–CV–W–3.

United States District Court,
W.D. Missouri,
Western Division.

Sept. 8, 1998.

Jennifer Ruth Bragg Rose, Independence, MO, Pro se.

Michael Scott Rose, Independence, MO, Pro se.

John Lewis, Jr., Kansas City, MO, Trustee.

## ORDER AFFIRMING IN PART DECISIONS OF THE BANKRUPTCY COURT AND REMANDING FOR FURTHER PROCEEDINGS

SMITH, District Judge.

Pending is an appeal from an order of the Bankruptcy Court discharging certain Guarantied Student Loan obligations.[1] Separate briefs have been filed by the United States of America on behalf of the Department of Education ("United States") and the Missouri Student Loan Program ("MSLP"). In addition, the Nebraska Student Loan Program ("NSLP"), the Illinois Student Assistance Commission ("ISAC"), and United Student Aid Funds, Inc. ("USAFI") have joined in the United States' and MSLP's briefs in this matter.

Also pending, and consolidated with the appeal described above, is the United States' and MSLP's appeal from the Bankruptcy Court's denial of their Motion for Reconsideration pursuant to Bankruptcy Rule 9024(b). The Nebraska Student Loan Program and the Illinois Student Assistance Commission have joined in the United States' brief even though they were not parties to the Motion for Reconsideration.

For the following reasons, the Court affirms the Bankruptcy Court's determinations with respect to application of the Eleventh Amendment, but remands for further consideration on the issue of undue hardship.

### I. BACKGROUND

Jennifer Rose filed a Complaint to determine the dischargeability of her student loans. North Star Guarantee failed to respond and a default judgment was eventually entered against it. The University of Missouri did not file a proof of claim, but responded by filing a Motion to Dismiss based on the Eleventh Amendment to the United States Constitution. MSLP filed a proof of claim and, after the hearing on October 1, 1997 (discussed below), also sought dismissal based on the Eleventh Amendment. The remaining defendants also filed proof of their claims in the main bankruptcy case but did not raise the Eleventh Amendment as a defense. *Rose II*, 215 B.R. at 758 (discussing fact that MSLP was the only defendant other than the University of Missouri to discuss the Eleventh Amendment).

An evidentiary hearing was held on October 1, 1997. On November 10, 1997, the Bankruptcy Court dismissed the University of Missouri based on the Eleventh Amendment and reserved ruling on whether MSLP (and the other state-actor defendants) had waived the Eleventh Amendment's protection by virtue of their filing proofs of claim. Neither North Star Guarantee nor the University of Missouri are parties to this appeal.

On December 19, 1997, the Bankruptcy Court ruled that the remaining state-actor defendants had waived the Eleventh Amendment's protection by filing proof of their claims. The Bankruptcy Court then found that Debtors' repayment of the student loans would constitute an undue hardship within the meaning of section 523(a)(8)(B) of the Bankruptcy Code and (very reluctantly) discharged the remaining student loans.

The Bankruptcy Court considered the factors set forth in *Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395 (2d Cir.1987) and found that Jennifer Rose took out student loans totaling approximately $105,000 to finance her undergraduate and law school education. Rose graduated from law school in the Spring of 1995. At the time of the hearing, she worked as a law clerk for the Jackson County Associate Circuit Court (a job she began in April 1996) with a net monthly income of slightly more than $1,750.[2]

---

1. The Bankruptcy Court's decisions in this matter are reported as *Rose v. United States Dep't of Educ. (In re Rose)*, 214 B.R. 372 (Bkrtcy.W.D.Mo. 1997) ("*Rose I*") and *Rose v. United States Dep't of Educ. (In re Rose)*, 215 B.R. 755 (Bkrtcy. W.D.Mo.1997) ("*Rose II*").

2. The monthly net income figure was based on Jennifer's prior annual salary of $26,700 and appeared on her bankruptcy schedules. At an unspecified point in time prior to the hearing, the Associate Circuit Court raised her annual

Her husband was not employed and stayed home to care for their two children. The oldest child was almost three years old at the time of the hearing, and the youngest child was born on September 4, 1997—while the case was pending in Bankruptcy Court. The family incurs reasonable monthly expenses (excluding credit card payments and student loan payments) of nearly $1,820 per month. Michael does not work for a variety of reasons, among which was the fact that Michael's earnings would be exceeded by child care costs. The Bankruptcy Court acknowledged that both children would be in school in six years, at which time Michael could get a job and earn between $900—$1,000 a month. By that time, there would be only six years to pay off the loans along with the six years worth of interest that accrued at the rate of 8% per year. The Bankruptcy Court also found that it was not likely that Jennifer could find a higher paying job because the market for new attorneys is "tight." *Rose II*, 215 B.R. at 765.

There was also evidence of several repayment plans. An income contingent repayment plan would have required the Debtors to make payments based on their income; in this case, had their monthly income remained unchanged the Debtors would have been required to make monthly payments of approximately $136. However, these payments would have been greatly exceeded by the interest that would have accrued, so the Debtors would continuously fall further and further behind—assuming, of course, that they could find $136 to pay each month. The trend of falling further behind each month would also depend on there being no increases in the Debtors' income. The outstanding balance would be excused after twenty-five years, but the amount excused would constitute taxable income.

Jennifer also testified about consolidating the loans as an option. However, consolidation was not possible unless and until (1) all payments were current, and (2) consent was obtained from the guarantors. The Debtors lacked the financial ability to pay all missed payments, and consent from guarantors was

salary to $30,000. *Rose II*, 215 B.R. at 763 & n. 5.

not necessarily automatic. Finally, even if the loans were consolidated, the monthly payments would be between $788 and $861 per month (depending upon certain other options). R. at 333–34.

Finally, the Bankruptcy Court considered whether the Debtors had made a good faith effort to repay Jennifer's student loans. The Bankruptcy Court declared that "although it shares the creditors' frustration with Michael Rose's employment situation, the reality is that the cost of child care will be greater than his income." *Rose II*, 215 B.R. at 765. The Bankruptcy Court went on to find that "Jennifer Rose has made reasonable efforts to obtain the best job she can" and that the Debtors had "made reasonable efforts to minimize their expenses" and cited the ages and models of their cars, their failure to go out for meals or for entertainment, and the remaining portions of their budget were reasonable in light of their circumstances. *Id.* The Debtors' failure to make any repayments on the student loans (which typically would be considered a lack of good faith) was excused because "the [D]ebtors were operating at a deficit in the first place [so] there was no money to make such an attempt to pay the student loans." *Id.* at 766.

On March 19, 1998, the United States filed a Motion for Relief from Judgment pursuant to Bankruptcy Rule 9024(b), which closely tracks Federal Rule of Civil Procedure 60(b) in allowing relief from judgment for "newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial. . . ." A hearing was held on April 14, 1998, and the United States attempted to present three ·lines of argument: (1) that Jennifer had obtained a higher paying job since the Bankruptcy Court's December 19, 1997 decision, (2) additional refinancing options existed, and (3) proposed legislation would remove the tax burden of any forgiven student loan debt.

It was established that Jennifer took a slightly [3] higher paying job in February 1998 due, in part, to the fact that the University of Missouri loan had not been discharged. R.

3. The new job paid $10,000 more annually than did her prior job.

at 1001. The Bankruptcy Court noted that "the increase in income was minimal, particularly when parking and health insurance differential is taken into account." R. at 895. The Bankruptcy Court ultimately denied relief with respect to this issue because the evidence was not "newly discovered" because it was not in existence at the time of the hearing and, in any event, did not substantially change the Debtors' ability to repay the loans or the Bankruptcy Court's opinion about Jennifer's future earning potential.

Although evidence of the additional repayment options existed at the time of the original hearing, the Bankruptcy Court declined to rely on them to change its opinion because the information could have been discovered through due diligence on the United States' part. Furthermore, the options did not indicate any less of a hardship than the options discussed at the October 1, 1997 hearing. Finally, the prospect of possible legislative changes that might relieve the tax burden imposed by forgiving the student loans was deemed too speculative to provide a basis for changing the Bankruptcy Court's decision.

## II. DISCUSSION

### A. Standard of Review

■ On appeal from the Bankruptcy Court's decision, "[f]indings of fact are reviewed for clear error and conclusions of law are reviewed *de novo.*" *Alport v. Ritter (In re Alport),* 144 F.3d 1163, 1166 (8th Cir. 1998).

### B. Eleventh Amendment Immunity

■ As a general matter, the Eleventh Amendment prohibits citizens from suing a state in federal court, absent the waiver of that protection by the state or proper abrogation of that protection by Congress. The Court will accept, for the sake of argument, that all Appellants other than the United States are either alter egos or instrumentalities of a state and, therefore, entitled to invoke Eleventh Amendment protection.[4]

■ Section 106(a) of the Bankruptcy Code purports to abrogate the states' Eleventh Amendment immunity, but it must be analyzed to determine whether Congress passed section 106(a) pursuant to a Constitutional provision permitting it to abrogate Eleventh Amendment protections. *See Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 58–59, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). The *Seminole Tribe* Court engaged in an extensive discussion of the history and purposes of the Eleventh Amendment, noting that it was designed to protect state sovereignty from federal judicial power. The Court observed that the Fourteenth Amendment empowers Congress to abrogate Eleventh Amendment protections because it contains prohibitions targeted directly to the states and specifically empowers Congress to enforce its provisions. Thus, the Fourteenth Amendment, by expressly expanding federal power at the expense of state autonomy, had fundamentally altered the balance of state and federal power struck by the Constitution. 517 U.S. at 59, 116 S.Ct. 1114. With respect to legislation passed under some other grant of Congressional power, "[t]he Eleventh Amendment restricts the judicial power under Article III, and Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction." *Seminole Tribe,* 517 U.S. at 72–73, 116 S.Ct. 1114.

There is no serious suggestion that the Bankruptcy Act as a whole, or section 106 of the Bankruptcy Act in particular, was enacted pursuant to Congress's powers under the Fourteenth Amendment. Undoubtedly, these

---

4. Because the Eleventh Amendment provides protection from suit only for states, this discussion does not apply to the United States. The Court agrees with (and the Debtors do not appeal) the Bankruptcy Court's determination that MSLP is an instrumentality of the state. Although ISAC, NSLP and USAFI did not assert an Eleventh Amendment defense in the Bankruptcy Court (a fact that does not constitute a waiver of the defense, *see Calderon v. Ashmus,* —— U.S. ——, —— n. 2, 118 S.Ct. 1694, 1697 n. 2, 140 L.Ed.2d 970 (1998)) or file their own briefs in support of their position on appeal, the Court suspects—based solely on their names—that ISAC and NSLP are arms of their respective states. Such a leap of faith is unwarranted with respect to USAFI. In any event, the point need not be discussed further because of the Court's ultimate conclusion that the Appellants all waived whatever Eleventh Amendment protection they might have.

provisions were passed pursuant to Congress's power to establish "uniform Laws on the subject of Bankruptcies throughout the United States," which power lies under Article I of the Constitution (and, interestingly, one clause removed from the Indian Commerce Clause, which was the subject of *Seminole Tribe* ). *See* U.S. Const. art. I, § 8, cl. 4. Based on *Seminole Tribe,* this Court joins those other courts which have held that section 106(a) is an invalid attempt to abrogate the states' protections under the Eleventh Amendment. *E.g., Department of Transp. & Dev. v. PNL Asset Management Co., LLC (In re Fernandez),* 123 F.3d 241, 244 (5th Cir.1997); *Schlossberg v. State of Maryland Comptroller of the Treasury (In re Creative Goldsmiths of Washington, D.C., Inc.),* 119 F.3d 1140, 1145–47 (4th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1517, 140 L.Ed.2d 670 (1998); *see also Hoffman v. Connecticut Dep't of Income Maintenance,* 492 U.S. 96, 105, 109 S.Ct. 2818, 106 L.Ed.2d 76 (1989) (Scalia, J., concurring).

■ Eleventh Amendment protections can also be waived [5] by action on the state's part. "Courts have inferred a waiver when the State has made a general appearance in federal court and defended a lawsuit on the merits." *Hankins v. Finnel,* 964 F.2d 853, 856 (8th Cir.), *cert. denied,* 506 U.S. 1013, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992); *see also*

*Thomas v. FAG Bearings Corp.,* 50 F.3d 502, 506 (8th Cir.1995). Such a waiver is not necessarily a general waiver, but may be limited in light of the nature of the suit. *Hankins,* 964 F.2d at 856. Every court to address the matter has concluded that when a state files a proof of claim or seeks other recourse in Bankruptcy Court, it waives its Eleventh Amendment immunity with respect to the debt that constitutes the claim. "[A]ny governmental entity which elects to join the ranks of creditors seeking benefits the bankruptcy court can allocate must recognize that resort is subject to the mantle of equity. Indeed, '[w]hen the State becomes the actor and files a claim against the bankruptcy fund, it waives any immunity which it otherwise might have had respecting the adjudication of the claim.'" *In re Straight,* 143 F.3d at 1389–90 (quoting *Gardner v. New Jersey,* 329 U.S. 565, 574, 67 S.Ct. 467, 91 L.Ed. 504 (1947)); *see also In re Burke,* 146 F.3d at 1318–20; *Dekalb County Div. Of Family & Children Servs. v. Platter (In re Platter),* 140 F.3d 676, 679–80 (7th Cir.1998); *In re Creative Goldsmiths,* 119 F.3d at 1148. The Court concludes that filing a proof of claim with respect to the student loans waived any Eleventh Amendment protection that might exist with respect to the Bankruptcy Court's use of its equitable powers (including the power to discharge) those debts.[6]

---

**5.** Section 106(b), which has not been the focus of the Court's discussion, provides that "[a] governmental unit that has filed a proof of claim in the case is deemed to have waived sovereign immunity with respect to a claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which the claim of such government unit arose." Other courts have suggested that this is simply a codification of waiver principles (which will be discussed later in this Order). *See State of Georgia Dep't of Revenue v. Burke (In re Burke),* 146 F.3d 1313, 1317 n. 8 (11th Cir.1998); *Wyoming Dep't of Transp. v. Straight (In re Straight),* 143 F.3d 1387, 1390 (10th Cir.1998). Certainly, if it purports to be anything more, it would run afoul of *Seminole Tribe,* so the Court will follow *Burke* and *Straight* and construe section 106(b) to be co-extensive with cases describing waiver of Eleventh Amendment protections.

**6.** MSLP contends that if filing a proof of claim constitutes a waiver, it is a limited waiver and a discharge of the debt is beyond the scope of that limitation. This narrow view fails to account for the unique mechanism that bankruptcy repre-

sents. In presenting its claim for the Bankruptcy Court's consideration, MSLP empowered the Bankruptcy Court to determine whether the claim was valid, the amount of the claim, and its priority in the distribution of assets. MSLP does not (and cannot) contend that the Eleventh Amendment barred the Bankruptcy Court from determining (if appropriate) that the claim was worth less than the amount alleged, was entitled to a lesser position of priority than alleged, or was simply invalid. In light of all the consequences MSLP opened itself to, and in light of the fact that discharge is one of the many equitable powers available to bankruptcy courts the Bankruptcy Court was empowered to discharge the claim if it was proper to do so under the Bankruptcy Code. "[B]y filing a claim against a bankruptcy estate the creditor triggers the process of allowance and disallowance of claims, thereby subjecting himself to the bankruptcy court's equitable power." *Langenkamp v. Culp,* 498 U.S. 42, 44, 111 S.Ct. 330, 112 L.Ed.2d 343 (1990) (per curiam) (quotation omitted).

### C. Undue Hardship Under 11 U.S.C. § 523(a)(8)(B)

A decision that student loans impose an undue hardship is a legal question to be reviewed *de novo*, but the factual findings underlying that decision are reviewed for clear error. *Tennessee Student Assistance Corp. v. Hornsby (In re Hornsby)*, 144 F.3d 433, 436 (6th Cir.1998). The Bankruptcy Code does not define the term "undue hardship," and the bankruptcy courts in this district have adopted the Second Circuit's test in *Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395 (2d Cir.1987).[7] *Brunner* establishes a three part test:

(1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*Brunner*, 831 F.2d at 396. The burden of proof lies with the debtor to prove undue hardship, and failure to satisfy any one of these three components bars discharge.

Prior to the Second Circuit's decision in *Brunner*, the Eighth Circuit had occasion to discuss the undue hardship test under section 823(a)(8)(B) in *Andrews v. South Dakota Student Loan Assistance Corp. (In re Andrews)*, 661 F.2d 702 (8th Cir.1981). After noting that the Bankruptcy Code does not define the phrase "undue hardship," the *Andrews* court generally described the test as questioning whether the debtor's future resources would sufficiently provide for a "minimal standard of living" and still leave something to pay the educational debt. 661 F.2d at 704. The Eighth Circuit ultimately approved an inquiry that considered the debt-or's present employment and financial situation (including assets, expenses and earnings) along with the prospects for future changes (either positively or negatively) in the debtor's financial position. *Id.*

Application of *Andrews* (which binds the Court in this case) is difficult because it has never been discussed by the Eighth Circuit since it was decided. *Andrews* appears very similar to *Brunner*, with the obvious omission of *Brunner's* third element.[8] This omission suggests that the Bankruptcy Court should not consider the third component of *Brunner's* test. Inasmuch as the Bankruptcy Court ultimately ruled in the Debtors' favor, the inclusion of this element resulted in no harm.

Of more significance are the considerations employed by the *Andrews* court. In remanding the case to the bankruptcy court, the Eighth Circuit directed close scrutiny to determining "whether there would be anything left from the debtor's estimated future income to enable the debtor to make *some* payment on his/her student loan without reducing what the debtor and his/her dependents need to maintain a minimal standard of living." *Andrews*, 661 F.2d at 704 (quotation omitted) (emphasis supplied). On remand, the bankruptcy court was directed to consider the debtor's accumulated wealth and her reasonable prospects for accumulating wealth and earning income in the future, as well as the likely prospects for change in those conditions. The debtor in *Andrews* suffered from Hodgkins disease and worked in a state-supported shelter for victims of domestic abuse. Therefore, the bankruptcy court was directed to "carefully examine the scope of the debtor's group health insurance coverage [and] consider any additional information about the debtor's present employment status and employment prospects, in particular" whether the shelter would continue to be

---

7. *See, e.g., Dotson–Cannon v. Department of Educ. (In re Dotson–Cannon)*, 206 B.R. 530, 533 (Bkrtcy.W.D.Mo.1997); *O'Brien v. Household Bank FSB (In re O'Brien)*, 165 B.R. 456, 459 (Bkrtcy.W.D.Mo.1994); *Wardlow v. Great Lakes Higher Educ. Corp. (In re Wardlow)*, 167 B.R. 148, 151 (Bkrtcy.W.D.Mo.1993); *Ipsen v. Higher Educ. Assistance Found. (In re Ipsen)*, 149 B.R. 583, 585 (Bkrtcy.W.D.Mo.1992); *Cardwell v.*

*Higher (In re Cardwell)*, 95 B.R. 121, 122 (Bkrtcy. W.D.Mo.1989).

8. The Sixth Circuit has indicated that *Andrews* is different from *Brunner*. *Cheesman v. Tennessee Student Assistance Corp. (In re Cheesman)*, 25 F.3d 356, 359 (6th Cir.1994), *cert. denied*, 513 U.S. 1081, 115 S.Ct. 731, 130 L.Ed.2d 634 (1995).

funded. *Id.* at 705. Finally, the bankruptcy court was instructed to consider the possibility of deferring a decision on dischargeability and the availability of administrative avenues for deferring, forbearing or canceling the loans. *Id.* at 705 n. 5. Although these two latter options may no longer be available under current law, they demonstrate the type and depth of analysis sought by the Eighth Circuit.

■ Turning now to the facts of this case, the Court concludes that the Bankruptcy Court's determination that the Debtors' monthly expenditures totaled $1,819—and its companion determination that this sum is reasonable—is not clearly erroneous. The Court also credits the Bankruptcy Court's determinations that, at the time of the hearing, (1) Jennifer's net monthly income was $1,748, (2) Michael's earning capacity was between $900 and $1,000 per month, and (3) childcare for both children would exceed Michael's earning capacity. Nonetheless, in predicting the possibility of future changes in the Debtors' fortunes, the Court believes that *Andrews* dictates a more searching inquiry. For instance, childcare costs were predicated on two children, and the Bankruptcy Court considered this cost to be a constant for six years—that is, until the younger child starts kindergarten. Obviously, the older child will start kindergarten within six years, leaving only one child to be left in day care if Michael goes to work. Having one child in day care would logically cost less than having both children in day care. In addition, it is proper to consider the tax benefits (in the form of credits) that the Debtors would receive as an offset to these costs. I.R.C. § 21.

■ The Court also believes that Jennifer's future earning potential deserves closer scrutiny. As a lawyer who only recently entered the practice of law, Jennifer's earnings at the time of the hearing were understandably lower than one might expect for one who had been practicing longer. This earning trend is common to all occupations: earnings are typically lower at the beginning of a career than in the middle or at the end.

Although the market for lawyers at the time of the hearing was, as described by the Bankruptcy Court, "tight," *see* R. at 346–47, this is not a trend that necessarily would continue over the course of the ensuing twenty-five years. Furthermore, in demonstrating that Jennifer's earning power is not likely to improve (a burden that falls on the Debtors because they must prove undue hardship), the Debtors must present something that proves their point—which they have not done. Jennifer suggested that she was not actively looking for a different job (or had given up on doing so), but her subjective plans are not relevant. A debtor cannot choose to take a low paying job and eschew a higher paying job (without compelling reason, which must be more than mere convenience) and thereby create undue hardship. Thus, the question is not what the debtor makes, or what the debtor plans to make in the future; the question is what is the debtor capable of earning. As a general matter, the debtor should present some sort of data demonstrating the average or expected earning potential of people in his or her occupation. In this case, Jennifer should present information demonstrating the earning potential of a lawyer in the first twenty-five years of their career. Due regard should be given to Jennifer's scholastic record (which may be a greater factor early in her career) as well as the positive effects her employment with the Associate Circuit Court would have.

■ MSLP and the United States insist the Bankruptcy Court erred in considering the Debtors' ability to repay over only ten years instead of considering the twenty-five year term that is available in a variety of refinancing options. The Court agrees that the twenty-five year option should be considered, but does not agree that it was ignored by the Bankruptcy Court. However, one of the Bankruptcy Court's chief concerns—the potential for a large income tax burden if the outstanding balance is forgiven—can be ameliorated (much in the same way Andrews' medical expenses could be ameliorated with insurance).[9] The Internal Revenue Service

9. The Bankruptcy Court concluded that the large tax debt would arise because under the refinancing plan under discussion the Debtors would be

paying only $136 a month. This amount was the amount the Debtors would be required to pay under the income contingent plan based on their

is authorized to forgive tax debt through offers of compromise if there is doubt as to collectibility. 26 C.F.R. § 301.7122–1. If the Debtors' financial situation remains as morose as they believe it will, then foregiveness or compromise will be viable options.

■■■■■ "[T]he bankruptcy court's determination of undue hardship will necessarily involve a certain amount of speculation about the debtor's financial circumstances." *Andrews*, 661 F.2d at 705 n. 5. As stated earlier, the burden for proving undue hardship falls on the debtor. In order to satisfy that burden, the debtor must present evidence that provides a basis for making the necessary projection about the debtor's financial prospects. Here, Jennifer effectively has twenty-five years to repay the loans. Under the unique circumstances of this case, she can refinance the obligation in such a way that any balance owed at the end of that term is forgiven. This makes it less important that she actually be able to pay the entire debt; even if she can only repay a portion of the debt, she should do so. The excused balance may create a tax obligation, but this obligation may, if appropriate, be excused. Finally, until the Debtors present more, less-subjective evidence of Jennifer's future earning prospects as a lawyer, the record does not support *Andrews'* second component.

For these reasons, the case is remanded for reconsideration and further development of the record consistent with *Andrews* and this Order. On remand, the Bankruptcy Court will be seeking to make the best possible forecast of the Debtors' financial future. This will necessarily include consideration of Jennifer's employment status at the time of the rehearing, as well as her activities since the October 1997 hearing,[10] together with other factors that bear on the Debtors' financial prospects and ability to make themselves able to repay some portion of the loans.[11]

### III. CONCLUSION

For the foregoing reasons, this case is remanded to the Bankruptcy Court for further proceedings as described in this Order.

IT IS SO ORDERED.

---

income and family size at the time of hearing. Under the income contingent plan, the monthly payments would increase as the family's income increased. In estimating the outstanding balance at the end of the twenty-five year term (and the corresponding tax liability), the Bankruptcy Court did not consider Michael's eventual return to the work force or higher paying jobs for Jennifer.

10. This makes it unnecessary to separately consider the appeal from the denial of the Rule 60(b) Motion; these matters (except proposed changes in legislation, which are simply too speculative to rely on) should be considered on remand.

11. Some of the additional factors have been mentioned elsewhere in this Order: predicted earnings for those in Jennifer's profession, (which, in this case, are available through the Missouri Bar), the ability to restructure the loans to include a twenty-five year payment term, Michael's eventual return to the workplace, tax benefits that offset the cost of childcare, IRS regulations regarding the compromise of tax

debts, and the fact that within two to three years one of the Debtors' children will be in kindergarten, thereby decreasing their childcare costs if Michael returns to work. Other considerations might include the effect on the family's budget when their infant no longer needs formula or diapers, the availability of private childcare providers that cost less than the institutions considered by the Debtors, the plausibility of Michael caring for other children in the home (thereby earning money while staying at home), and the possibility of the Debtors' parents caring for the children on either a regular basis (to permit Michael to return to full-time work) or on an emergency basis (to permit Michael to work at night or on weekends). The Debtors have the burden of proving undue hardship, and they should be expected to present evidence demonstrating that they have done everything possible to minimize expenses and maximize income, as well as evidence demonstrating the possibility for change in the future. This does not foreclose the creditors from presenting contrary evidence; in fact, they may find it advisable to raise some of these issues on their own.